**RUTAR FARMS AND LIVESTOCK, INC.,
a Wyoming Corporation, and Rudolph J.
Rutar, Appellants (Plaintiffs),**

v.

**Ronald D. FUSS and Margie D. Fuss,
husband and wife, Appellees
(Defendants),**

v.

**The STATE of Wyoming, acting Through
the WYOMING GAME AND FISH
COMMISSION, Appellee (Defendant
and Third-Party Plaintiff),**

v.

**Leon EISENBARTH and Lillian Alma
Eisenbarth, Appellees (Third-Party
Defendants).**

No. 5684.

Supreme Court of Wyoming.

Oct. 4, 1982.

Frank J. Jones, Wheatland, for appellants.

Steve Graham of Jones & Graham Law Offices, Torrington, for appellees Fuss.

Thomas C. Bogus, Sr. Asst. Atty. Gen., Cheyenne, for appellee State of Wyoming, acting through the Wyoming Game and Fish Commission.

Stanley K. Hathaway and Richard J. Barrett of Hathaway, Speight & Kunz, Cheyenne, for appellees Eisenbarth.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY, and BROWN, JJ.

BROWN, Justice.

Appellants sued in the district court to quiet title to about 31 acres of land. Their theory of recovery was ownership by adverse possession. Appellees Fuss and the State of Wyoming are record titleholders of the disputed land. The trial judge entered judgment in favor of the record titleholders and quieted title in them. Appellants designate the issues as follows:

1. Did the plaintiffs and their predecessors in interest have actual, open, notorious, exclusive and hostile possession of the disputed lands under a claim of right for a period of ten consecutive years?

2. Were the trial court's Findings of Fact and Conclusions of Law incomplete and in error?

We will affirm.

A sketch of the area, although not to scale, may help.

The disputed land involves two adjoining tracts immediately north of the North Platte River. Appellees Fuss are the record titleholders of the SW¼NE¼, Section 32. Appellee State of Wyoming is the record titleholder of 17.58 acres of the SE¼NE¼, Section 32. Appellants are the record titleholders of the N½NE¼ of Section 32, which land is immediately north of the disputed tracts. Appellants claim the northernmost 13.9 acres of the Fuss tract and the 17.58 acres of the State of Wyoming tract. The North Platte River flows easterly across the S½NE¼ of Section 32, leaving a portion of the SW¼NE¼ and the SE¼NE¼ lying north of the river and a portion lying south of the river.

Rudolph Rutar acquired title to the N½NE¼ of Section 32 in 1951. In 1979, he conveyed an undivided one-half interest in the property to his son, Rudolph J. Rutar,

who in turn conveyed this one-half interest to appellant Rutar Farms and Livestock, Inc., a family owned corporation. The senior Rutar has contracted to sell the remaining one-half interest to his son, Rudolph J. Rutar, the other appellant.

Appellees Fuss acquired title to one of the tracts in dispute in 1980, from Ronald D. Fuss' parents. Ronald Fuss' parents, John and Martha Fuss, acquired title to the land in August, 1974.

The State of Wyoming acquired title to the other disputed tract in 1979, from third-party defendants and appellees, Leon Eisenbarth and Lillian Alma Eisenbarth. The Eisenbarths acquired their title to this disputed tract in 1965.

This is a classic case to illustrate that adjoining landowners have little concern about boundary lines when the land is of negligible value, but that when the land becomes valuable, boundaries become important. The character of the disputed land may help explain the landowners' attitude toward the land before suit. Because of the river, the disputed land was inaccessible to appellees Fuss and Eisenbarth and their predecessors. The trial court determined that the highest and best use of the disputed land was a wildlife refuge. Boundaries became important to the parties after the Wyoming Game and Fish Commission purchased 17.58 acres from the Eisenbarths.

Other facts will be set out as necessary.

### I

█ The elements of adverse possession consist of actual, open, notorious, exclusive and continuous possession of another's real property for the statutory period, which possession must be hostile, and under a claim of right or color of title. *D. A. Shores v. D. L. Lindsey*, Wyo., 591 P.2d 895 (1979).

█ Appellants contended at trial and on appeal that title to the disputed lands vested in them not later than March, 1961, ten years after their possession. They also state in their brief that they and their predecessors have had actual possession of the disputed tracts since at least 1941, and they bring to our attention the law of "tacking" in adverse possession cases.[1] Appellants have, however, made no showing that tacking applies to this case, and apparently do not seriously contend that a period of adverse possession by their predecessor in title should be tacked on to a period of adverse possession by them. In any event, appellants failed to prove that their predecessor in title adversely possessed the disputed land. Mr. Mort, a witness for appellants, gave testimony regarding the use made by Mr. Dupertuis, appellants' predecessor in title of the disputed land:

"Q. Did you observe cattle on that land [disputed land]?

"A. He was a pony man, (Mr. Dupertuis) not cattle.

"Q. Horses then. Did he have livestock on that land and use it for grazing purposes?

"A. Yes, sir.

"Q. And do you know how often he used it?

"A. No, sir.

"Q. You did see livestock over there. Was it every year, every other year, or do you really know?

"A. I couldn't say on the land. It was poor enough land even if they was in there they might not be down there for a year or so."

This evidence does not show any of the elements in support of adverse possession by appellants' predecessor in title. Appellants must therefore rely on their own asserted possession after March, 1951, to prove adverse possession.

Appellants tried to show that the existence of a fence along the river and the nonexistence of a boundary fence, together with the fact that their cattle grazed on the

---

1. " * * * 'Tacking' is that doctrine which permits an adverse possessor to add his period of possession to that of a prior adverse possessor in order to establish a continuous possession for the statutory period. [Citation.]" *Deyrup v. Schmitt*, 132 Vt. 423, 425, 321 A.2d 42, 44 (1974).

disputed tracts, constituted open and notorious intent to adversely possess the disputed tracts. The most glaring deficiencies in appellants' proofs are the elements of notorious, exclusive and hostile possession under a claim of right, elements which are interrelated and will be discussed together.

There was much testimony about several fences, but we think only two fences were significant. One fence was on a line dividing the S1/2NE1/4 from the N1/2NE1/4 (point A to point B on sketch). This fence would divide appellants' land of record from appellees' land of record. The other fence roughly paralleled the North Platte River on the southern border of the disputed tracts.

■ There was a sharp conflict in testimony regarding the existence and quality of the two fences. In cases depending heavily upon resolution of conflicts in the evidence, we favor the evidence of the prevailing party and presume specific findings to be correct unless clearly erroneous or against the great weight of the evidence. *Mountain Fuel Supply Company v. Central Engineering & Equipment Company,* Wyo., 611 P.2d 863 (1980). With respect to the fence dividing the N1/2NE1/4 from the S1/2NE1/4, the trial judge found:

"12. Beginning in 1955, Mr. Shain observed a fence extending easterly [sic] from the Northeast corner of the S1/2NE1/4 of Section 32 along the northern boundary of the S1/2NE1/4 of Section 32 which was in sufficient repair and condition so as to prevent the crossing of the fence on horseback. During those occasions on which his cattle strayed into the S1/2NE1/4 of Section 32, Mr. Shain was forced to use a gate in the fence line on the northern boundary of the SE1/4NE1/4 of Section 32 in order to retrieve his cattle.

\*　\*　\*　\*　\*　\*

"14. On at least two occasions since 1965, Leon Eisenbarth observed the remnants of a fence beginning at the Northeast corner of the SE1/4NE1/4 of Section 32 and extending several hundred feet along the northern boundary line of said quarter section."

In Finding Number 12 the trial judge found "a fence extending *easterly* from the northeast corner (Point B in sketch) of S1/2NE1/4 of Section 32 along the northern boundary of S1/2NE1/4 of Section 32." The trial judge should have said *westerly* instead of *easterly.* This correction is consistent with the witnesses' testimony.

■ Mr. Shain owned land north and east of the disputed tracts. He had lived in the area since 1955 and was familiar with the disputed tracts and other lands of parties. Mr. Shain testified several times that there was a fence from Point A to Point B, which would have been the fence dividing the N1/2NE1/4 from the S1/2NE1/4. (See sketch). The following excerpt from Mr. Shain's testimony is illustrative:

"Q. You didn't see any fence from A to B, though?

"A. Oh, yes, I went through the gate.

"Q. There was a fence from point A to point B on the half section line?

"A. Yes.

"Q. That's your testimony?

"A. Yes.

"Q. A to C to B?

"A. There was a fence from this point B to as far as I ever got over that way because we could never ride a horse through any of that to go to the cattle except coming through the gate."

Mr. Shain also testified that the fence was in reasonably good repair. Some testimony was produced tending to impeach Mr. Shain's testimony. However, the weight to be given a witness' testimony and his credibility is for the trier of fact to determine. This Court must defer to the opportunity of the trial court to judge the credibility of the witnesses and may not set aside the trial court's findings even if it might have reached a different result. *Shores v. Lindsey,* supra.

Concerning the other significant fence, the trial judge found:

"15. Since at least 1941, a fence or the remnants of a fence, in various states of ill repair, has been situated along a

jagged line roughly parallel to the North Platte River in the S1/2NE1/4 of Section 32."

Testifying concerning the area paralleling the north bank of the river, Mr. Shain said: "Never a fence as what you would call a fence. There was posts, wire, you know—" Further testifying, he said: "Well, the fence over in this area where I was at the most, I mean there was just no fence existing." Other witnesses called by appellees testified that there was no fence or that there was a remnant of a fence in a dilapidated condition roughly following the north bank of the river.

■ According to appellate standards of review previously mentioned, we must accept as a fact that there was a boundary line fence between the deeded property of the appellees and the property of appellants; that is to say, there was a boundary line fence between the N1/2NE1/4 and the S1/2NE1/4 (Points A and B). We further agree with the trial court in its ultimate finding that the remnant of a fence along the north bank of the river was not a boundary line fence. An irregular fence, following the general course of a river and obviously not following what any reasonable person would consider a boundary line, appears to be a fence of convenience or a control fence rather than a boundary fence. From the facts we have recited, the obvious conclusion is that appellants never enclosed the disputed lands; therefore, the fences do not show appellants' open and notorious hostile intent to adversely possess the disputed lands. In fact, the fences show just the opposite; that is, that the appellees' fences enclosed their deeded property, which includes the disputed tracts.

Appellants never produced any testimony to show that they had the exclusive possession of the disputed tracts. Appellants' witnesses testified that their cattle grazed on the disputed lands every year since ownership. It is not clear from the record whether the cattle were purposely placed on the disputed land or whether they strayed on the land. Mr. Shain testified that appellants' cattle would get onto his property, then onto the disputed property. In addition to appellants' cattle grazing on the disputed land, Mr. Shain's cattle were also on the disputed property.

It was undisputed that over a long period of time numerous hunters and some appellees heavily used the disputed tracts for hunting. There was further evidence that these lands were marginal for grazing and better suited for hunting. Appellants did not post the lands against hunting nor attempt to control hunters. Appellees state that these facts show that appellants did not assert exclusive possession over the disputed tracts. We do not agree. We do believe, however, that appellants' failure to post the lands against hunters and otherwise control them is some indication that appellants did not attempt to assert dominion over the disputed lands, a factor which may be considered when trying to ascertain the claimants' intent. At any rate, the trial court concluded that appellants had not proved exclusive use of the disputed land, and we can sustain that conclusion because of failure of appellants' proofs and the fact that beginning in 1955 Mr. Shain's cattle also grazed the disputed tracts.

■ Notice of hostility must be given to a landowner so that he will know that his title is in jeopardy and that the running of the ten-year period necessary for adverse possession has started. Appellants did not tell anyone that they claimed the disputed lands, nor was their minimal use of the land such that would put the record titleholders on notice of an adverse claim. "It is well established that mere possession is not a sufficient basis for claim of title by adverse possession." 3 Am.Jur.2d Adverse Possession, § 12 (1962).

" * * * It has been declared that the disseisor 'must unfurl his flag on the land, and keep it flying, so that the owner may see, if he will, that an enemy has invaded his domains, and planted the standard of conquest. * * * '" *Marvel v. Barley*

*Mill Road Homes,* 34 D.Ch. 417, 104 A.2d 908, 911 (1954).[2]

Appellees' witnesses testified that the Eisenbarths, the State of Wyoming's predecessor, contacted the Rutars and offered to lease some of the disputed land for grazing. At this time the Rutars did not claim that they owned the disputed land; further, they said that they would contact the Eisenbarths to work something out. Appellant Rudolph J. Rutar acknowledged being contacted by the Eisenbarths with an offer to lease the disputed property. Mr. Rutar also admitted that it was only within the last three years that he first made it known to the Eisenbarths that he was claiming the property. It is significant that appellants did not assert ownership of the lands when the Eisenbarths suggested a possible lease, and that appellants left the impression that they would talk later with the Eisenbarths about a lease.

We believe that there was ample evidence as indicated above to support the court's Finding Number 17:

"17. On a few occasions since 1965, the Eisenbarths have observed the Rutars' cattle grazing in that portion of the SE1/4NE1/4 of Section 32 lying north of the North Platte River (hereinafter the 'Eisenbarth disputed land'). As a result, Leon Eisenbarth approached Rudolph Rutar in approximately 1973 and offered to lease the Eisenbarth disputed land to the Rutars as grazing land. Neither at that meeting nor at any time thereafter did Rudolph Rutar or any member of his family notify Leon Eisenbarth that the Rutars claimed ownership of the Eisenbarth disputed land."

■ In adverse possession cases the intent of the parties involved is most often controlling. *Gray v. Fitzhugh,* Wyo., 576 P.2d 88 (1978). "While the words of the claimant should be taken into consideration, intent as to the character of possession may be better ascertained by the acts of possession." *Shores v. Lindsey,* supra at 901. Appellants contend that they acquired title to

the disputed tracts not later than 1961. It might be argued, therefore, that what they did or failed to do after 1961 has little or no relevance, but we think appellants' conduct after 1961 indicates intent. Surely appellants had the same intent after 1961 as they did before with respect to the disputed tracts.

In their complaint appellants claimed all of the S½NE¼, Section 32, lying north of the river and some of the land south of the river. At the pretrial conference appellants amended their complaint to claim only that part of the S½NE¼ of Section 32 lying north of the river. At trial appellants further reduced their claim to only that portion north of a fence, or remnants of a fence which roughly parallels the north bank of the river. This indicates that appellants were not certain just what property they were claiming. "In order to establish title through adverse possession of real estate, the possession must be 'with the intent' to assert such adverse claim against the true owner." *Gray v. Fitzhugh,* supra, at 90.

When Rudolph Rutar, Sr., deeded one-half of the Rutar land to his son, in 1979, described as N½NE¼ of Section 32, he did not purport to convey any land in the S½NE¼ of Section 32, which is where the disputed lands are located. Mr. Rutar, Sr., demonstrated no intent to claim the lands when he deeded an undivided one-half interest of the Rutar land to his son.

■ Appellants did not pay property taxes on the disputed property. Failure to pay taxes is a fact to be considered along with others which tend to weaken a claim of ownership by adverse possession. *Meyer v. Ellis,* Wyo., 411 P.2d 338 (1966).

From the evidence we conclude that the trial court was correct in finding that appellants had no intent to adversely possess and that appellants were never sure just what land they claimed adversely. Their minimal use of the disputed lands was not sufficiently extensive to show any intent to

2. Disseisor: "One who puts another out of the possession of his lands wrongfully. A settled

trespasser on the land of another." Black's Law Dictionary 424 (5th ed. 1979).

exercise dominion over the land. The minimal use was never hostile, exclusive, or notorious and fell far short of alerting the record owners that title to their deeded land was in jeopardy.

Appellants rely heavily on *Meyer v. Ellis,* supra. In their brief they list thirteen similarities in this case and the Meyer case. Appellants ignore the fact that the trial court found against them on all critical factual issues, and appear to be asking this court to make a different factual determination than that made by the trial court.

In the *Meyer* case it was undisputed that the adverse possessors' possession of the disputed lands was actual, open, notorious, exclusive and continuous for the statutory period. In the case here the trial court generally found against appellants on these five essential elements, and as we have previously indicated, under our standard of review there was sufficient evidence to sustain the trial court's findings. Appellants in Meyer did not contend that appellee had not proved the first five essential elements in their adverse possession claim; they alleged and tried to prove permissive use and further alleged that appellee had not proved hostile possession under a claim of right. In Meyer the trial court had found against appellants on these two issues.

Because the disputed lands in the *Meyer* case were enclosed by appellees' fence, this court in Meyer concluded that the evidence was sufficient to show that the fence "formed an actual and visible enclosure of the disputed tracts with other lands" acquired by appellees' predecessor in title. This court in Meyer set out a rule concerning fences. The rule, which cites *City of Rock Springs v. Sturm,* 39 Wyo. 494, 273 P. 908, 916, 97 A.L.R. 1 (1929), says that under some circumstances a fence enclosing land might be sufficient to raise the "flag" of an adverse claimant. In the case here the trial court found, to the contrary, that there was a boundary line fence between appellants' deeded property and appellees' deeded property (Point A to B on sketch). The rule in Meyer has no application here.

Appellants also cite *Kranenberg v. Meadowbrook Lodge, Inc.,* Wyo., 623 P.2d 1196 (1981), for the proposition that after evidence has been presented establishing that a claimant has occupied a piece of ground for the period prescribed by law, openly, notoriously, exclusively, and in a manner plainly indicating that he is acting as owner, the legal owner must come forward and show that the possession was permissive or lose his property. *Kranenberg* has no application here because appellant never proved to the satisfaction of the court that the casual use of the disputed lands was open, notorious, exclusive, nor was the use in a manner plainly indicating that appellants were acting as owners. Permissive use is not an issue here, as the appellees never contended that they gave appellants permission to use the disputed lands.

## II

The appellants state that the findings in this case are perhaps not as much erroneous as they are incomplete. They further state that the trial court specifically erred in failing to enter a finding as to the exact location and extent of the fence line, if any, dividing the N½NE¼ from the S½NE¼ of Section 32. The appellants complained that the trial court used the terms "fence" or "remnants of a fence" in Findings 15, 16, 19, 20, 25, 26, 27 and 28. The appellants conclude that it was imperative for the trial court to make a determination whether a fence existed or whether a remnant of a fence existed. The appellants seem to be arguing, then, that the trial court could not have made any findings based on the existence of a boundary line or the remnants of a fence if it had not first made a finding that there was in fact a fence, or that there had been one, but that it no longer existed.

Appellants argue that under the ruling in *Shores v. Lindsey,* supra, the court was required to specifically find that there was or was not a fence extending across the entire boundary line separating the N½NE¼ from the S½NE¼. This Court said:

" * * * [T]he failure of the court to determine the location of the existing fence line with respect to the true boundary line as a finding of fact and to consider the legal effect of such fence resulted in a misapplication of the law as stated in the finding." *Shores v. Lindsay,* supra, at 901.

The *Shores* case has no application to the issue of fences in this case. In *Shores* the parties agreed that the fence line had been located in the same place for at least 40 years preceding litigation. The fact that claimant had annually grazed and pastured his cattle during the full growing season was also uncontroverted. Most significantly, the issue in *Shores* was not whether a boundary fence had at one time obstructed the grazing flow of the adverse possessors' cattle onto the record titleholder's land, as is the case here.

The result in *Shores* turned on the error of the trial court in failing to recognize that grazing and pasturage during the full period of the growing season is sufficient to establish exclusive use. In that respect, this Court indicated that since the undisputed existence and location of the wire fence supported the adverse possessors' allegations of cattle grazing, the trial court erred in failing to set forth a finding on the location of the existing fence line with respect to the true boundary line.

In *Shores* it was conceded by the parties that the elements of actual, open, notorious, and hostile possession under a claim of right had been satisfied; here appellants have failed to meet the burden of proof as to any of the elements of adverse possession. Consequently, even assuming that the court's finding regarding the fence is incomplete, any such incompleteness would not invalidate the ultimate decision of the trial court.

Under Rule 52(a), W.R.C.P., requested findings of fact are to be an aid to the appellate court, affording it a clear understanding of the trial court's decision. The trial court made 40 findings of fact and 17 conclusions of law. They are more than sat-isfactory. They indicate a consideration of the complex and vigorously disputed factual issues and of the multiple principles of law. We said in *Whitefoot v. Hanover Insurance Company,* Wyo., 561 P.2d 717, 720 (1977), that the findings do not need to be set forth in elaborate detail. They do have to be "clear, specific and complete, in concise language informing the appellate court of the underlying basis for the trial court's decision." The court's Findings of Fact and Conclusions of Law here served the purpose of Rule 52(a), W.R.C.P., and satisfied the requirement of *Whitefoot v. Hanover Insurance Company,* supra.

Affirmed.