# IN THE SUPREME COURT, STATE OF WYOMING

## 2024 WY 136

**OCTOBER TERM, A.D. 2024**

**December 13, 2024**

BOOT RANCH, LLC, a Wyoming close
limited liability company,

Appellant
(Defendant),

v.

WAGONHOUND LAND &
LIVESTOCK COMPANY, LLC, a
Wyoming limited liability company,

Appellee
(Plaintiff).

S-24-0045

*Appeal from the District Court of Converse County*
*The Honorable F. Scott Peasley, Judge*

*Representing Appellant:*
 *Jeffrey S. Pope, Macrina M. Sharpe, and Kasey J. Schlueter, Holland & Hart LLP, Cheyenne, Wyoming. Argument by Macrina M. Sharpe.*

*Representing Appellee:*
 *Kermit C. Brown and William L. Hiser, Brown & Hiser, LLC, Laramie, Wyoming. Argument by William L. Hiser.*

*Before FOX, C.J., and BOOMGAARDEN, GRAY, FENN, and JAROSH, JJ.*

*FOX, C.J., delivers the opinion of the Court; FENN, J., files a dissenting opinion.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]   In 2020, Wagonhound Land & Livestock, LLC purchased the 14,000-acre Tomahawk Ranch in Converse County and soon after brought an action against Boot Ranch, LLC to quiet title to approximately forty acres Boot Ranch had occupied and used since as early as 1984. Boot Ranch counterclaimed for adverse possession of the property. The district court found Boot Ranch had made its prima facie showing of adverse possession but that Wagonhound had rebutted the claim with evidence of a fence of convenience and of neighborly accommodation. The court thus concluded that Boot Ranch's occupation and use of the property was permissive and quieted title in Wagonhound's favor. Because the evidence does not support a finding that Boot Ranch's use of the disputed property was permissive, we reverse.

## ISSUES

[¶2]   The dispositive issues in this appeal are:

> 1. Did the district court err in finding that the fence partially enclosing the disputed property was a fence of convenience?
>
> 2. Did the district court err in finding that Boot Ranch's use of the disputed property was a neighborly accommodation?

## FACTS[1]

### I.   Property in Dispute

[¶3]   The property at issue is on the border between Tomahawk Ranch to the west and Boot Ranch to the east in Converse County, Wyoming. Wagonhound owns the approximately 14,000-acre Tomahawk Ranch, and Boot Ranch, LLC owns the approximately 9,000-acre Boot Ranch.[2]

[¶4]   The disputed property consists of two parcels totaling approximately forty acres and is shown on the map below as Parcels 1 and 2. The two parcels are in an area called the Dam Pasture, and they are bordered on the west by La Prele Reservoir. Wagonhound

---

[1] Because multiple members of the Cross family have a role in this matter, we will at times refer to them by their first names.

[2] Boot Ranch, LLC is an entity Richard Cross formed for estate planning purposes. Richard and his wife originally purchased Boot Ranch in 1974, and it became his sole property in 1981 after his wife's death. He transferred the ranch to Boot Ranch, LLC in 2012 and currently operates the ranch with his adult children, Shane Cross and Jamie Cross, and a few employees.

1

holds record title to the two parcels, but they are partially fenced into Boot Ranch as also depicted below. In the areas without fencing, natural barriers enclose the disputed property.



## II. The Dispute

[¶5] Diemer True and his immediate family, first through Diamond Ranches, LLC and then Tomahawk Ranch, LLC owned Tomahawk Ranch from 2007 to 2020.[3] Mr. True listed the ranch for sale in 2020, and in April 2020, Shane Cross reviewed the map included in the listing and saw that it showed Parcels 1 and 2 within the Tomahawk Ranch boundary. Shane investigated further and learned for the first time that Parcels 1 and 2 were within the legal description for Tomahawk Ranch.

[¶6] Shane contacted Mr. True and informed him that Boot Ranch was claiming ownership of Parcels 1 and 2. He asked Mr. True if there was a way to resolve the claim without going to court, and Mr. True informed him he was already under contract with Wagonhound. Shane followed up with an email again asserting Boot Ranch's ownership claim and stating, "I want to give you formal notice of this issue as early as possible

---

[3] For ease of discussion, we will refer to Mr. True as the owner of Tomahawk Ranch prior to the sale of the ranch to Wagonhound.

given that you listed the Tomahawk and so that your purchaser is aware of the claim." Mr. True forwarded the email to his attorney, who then forwarded it to representatives of Wagonhound.

[¶7]     Before Wagonhound closed on its purchase of Tomahawk Ranch, representatives of Wagonhound visited the disputed property and flagged or signed the property boundaries as they understood them. When Shane Cross found the markers, he removed them.

[¶8]     Wagonhound closed on its purchase of Tomahawk Ranch on June 2, 2020. On June 18, 2020, Shane Cross sent Wagonhound's general manager, Dustin Ewing, a text message, which stated:

> Dustin, I am certain that you know we are claiming ownership to lands within our pasture on the North and East side of LaPrele (sic) Reservoir. This is a courtesy text notifying you again not to access the land period. Do not harm or damage the existing fence between our pasture and the Tomahawk in any way. I intend to block any attempt to access the land and if you trespass again and build a fence I will remove the fence. I am sorry it's come to this, but I felt notifying you again is the right thing to do to avoid further conflict and further damage to our property due to unauthorized access. Thank you, Shane.

## III.     Legal Proceedings

[¶9]     On June 25, 2020, Wagonhound filed an action against Boot Ranch seeking to quiet title to Parcels 1 and 2 and for other related relief. Boot Ranch answered and counterclaimed for adverse possession of the parcels and to quiet title. The district court held a four-day bench trial at which the following testimony relevant to this appeal was received:

### A.     Diemer True

[¶10]  During the thirteen years Diemer True owned Tomahawk Ranch, he ran it as an agricultural operation with cows and calves and for a brief time, a herd of buffalo. He testified he never set foot on the disputed property, had no knowledge of the fence that partially enclosed it into Boot Ranch, and did not know when the fence was built or who built it. He also testified he saw people using Parcel 2 at least annually, never confronted those individuals, and never gave Boot Ranch permission to use the disputed property.

3

**B.     Richard Cross**

[¶11]   Richard Cross testified that he was born in December 1940 and grew up on Tomahawk (now Wagonhound) Ranch. The fence that encloses the disputed property into Boot Ranch has existed as long as he can remember and was there when he grew up on Tomahawk. He does not know who built the fence, and he agreed it does not run in a straight line and avoids obstacles such as rocks, trees, and other rough terrain.

[¶12]   Richard further testified that when he lived on Tomahawk Ranch, it was his understanding that Boot Ranch owned the property east of La Prele Reservoir. When Tomahawk cattle would breach the fence and enter the disputed property, Richard would enter the property through a gate in the fence and retrieve the Tomahawk cattle. Growing up on Tomahawk, he also recalled seeing Boot Ranch graze cattle on the disputed property. Finally, Richard testified that when he has provided legal descriptions of Boot Ranch, it was his understanding that those descriptions showed he owned all of the Dam Pasture.

**C.     Mark Norem**

[¶13]   Mark Norem is a real estate broker who has handled numerous real estate transactions on behalf of Wagonhound and negotiated its purchase of Tomahawk Ranch. As part of Wagonhound's due diligence, Mr. Norem visited the Tomahawk property with Dustin Ewing, Wagonhound's general manager, and Brad Neumiller, a surveyor. Mr. Norem testified that they examined the fence that encloses the disputed property and that it does not run in a straight line and meanders "a lot." He testified that the reason the fence meanders is the reservoir's water level, and that "[i]t's pretty obvious it's the water level of the reservoir had something to do with where they put the fence." He further testified that the fence is "not even close" to the legal boundary.

**D.     Brad Neumiller**

[¶14]   Brad Neumiller is a licensed land surveyor. He surveyed the existing fence and took GPS shots along the fence line. From those GPS shots, Mr. Neumiller found 32 "direction changes" in the fence, a couple 90-degree, or close to 90-degree, turns, and that the longest straight stretch of the fence was 288 feet, or a little shorter than a football field. Mr. Neumiller testified the fence did not run on the legal boundary and instead followed the high-water mark of La Prele Reservoir. He testified the fence uses trees and rocks as anchors, and he described it as a "four-strand barbed wire fence built of T-posts and wood."

[¶15]   Mr. Neumiller also testified to the presence of remnant fence-type materials, with some of the remnants located near the legal boundary. On cross-examination, he testified that he could not say that the remnants formed a boundary fence because they were not

on the boundary, and he did not know whether the remnants were from something else, like an enclosure for sheep. He further testified he did not know if the remnants were in their original location, or when or how the remnants got on the Boot Ranch property.

## E.     Dustin Ewing

[¶16]  Dustin Ewing, Wagonhound's general manager, testified that the disputed property is important to Wagonhound's holdings. Mr. Ewing described the fence that encloses the disputed property into Boot Ranch as an "old four-wire cattle fence, drift fence" that meanders, avoids obstacles and barriers, and uses trees, rocks, and bushes as fencing material. He opined that the location of the fence was for convenience, or ease of construction, rather than to mark boundaries. He further opined that its placement was more cost-effective than the true boundary line and was driven by the topography. He also testified that as to Parcel 1, the fence divides the grassland property from the reservoir.

## F.     Shane Cross

[¶17]  Shane Cross grew up on Boot Ranch and currently manages the ranch, which is primarily a cow-calf and haying ranch. He described the fence enclosing the disputed property into Boot Ranch "as being in good shape."

> The fence is a good cow fence. It's four wires through most of it. We maintain it every year, sometimes multiple times a year. It's like other fences on our ranch that we use to control our grazing, and to keep cows in and other cows out."

[¶18]  Shane further testified that over the years, the fence had been sufficient to exclude Tomahawk cattle from Boot Ranch, though cattle do occasionally breach the fence. He explained that Boot Ranch removes Tomahawk cattle from the property because it needs the grass for its own cattle.

[¶19]  Shane also testified that Boot Ranch has to his knowledge always used the property following the low water line of La Prele Reservoir as it receded. He testified that Boot Ranch cattle use both Parcels 1 and 2 for grazing. He summarized his family's use of the disputed property as, "We use it for our cows. We use it for water for our livestock. We use it for hunting. We use it for fishing. We use it to recreate. We use it for family get-togethers. And we love the place." He further testified as follows to the importance of the disputed property to Boot Ranch:

> It's instrumental to our grazing operation, to our ability to utilize that pasture. But it's also just our home and is culturally very important to us. We have a lot of memories

there. I grew up there. I grew up using that. I want my son to be able to grow up using that as well.

## IV.    The District Court's Ruling

[¶20]  The district court found that the disputed property had been partially fenced into Boot Ranch since before Richard Cross was born, over eighty years ago, and that since at least 1984, Richard Cross had used the disputed property as his own.[4] Specifically, the court found that Boot Ranch had continuously used the property to graze and water its cattle, and for recreation, hunting and fishing. The court further found (record citations omitted):

> 17. Since at least 1984, Richard Cross has used the Subject Property as his own, and he has always believed it to be part of Boot Ranch. Likewise, Richard's son Shane Cross has always believed the Subject Property was part of Boot Ranch. The court finds this testimony credible.
>
> . . .
>
> 42. At various times, Tomahawk cows have breached the Existing Fence and entered the Dam Pasture.
>
> 43. Shane Cross testified that he has taken Tomahawk cows out of Parcels 1 and 2 "every year." The court finds this testimony credible.
>
> 44. Shane Cross testified that when Tomahawk Ranch cattle strayed onto the Boot Ranch, he would either contact Diemer True to come get his cattle or put his cattle through the fence and back onto the Tomahawk Ranch.
>
> 45. When Boot Ranch cattle went onto the Tomahawk Ranch, Diemer True's employees would gather the Boot Ranch cattle and put them in a corral until Shane Cross could retrieve them.
>
> . . .
>
> 51. Since at least 1984, no other people have used the Boot Ranch – this is not a case of conflicting hostile use by competing landowners.

---

[4] The court excluded the period of 1974 to 1984 based on its finding that Richard Cross also had an ownership interest in Tomahawk Ranch during that period.

[¶21] Based on these findings, the court concluded that Boot Ranch had made a prima facie showing of adverse possession. The court further found, however, that Wagonhound had rebutted Boot Ranch's prima facie showing by proving that the fence partially enclosing the disputed property was a fence of convenience and that the parties had engaged in neighborly ranching practices. The court then shifted the burden back to Boot Ranch to prove a level of hostility sufficient to overcome the presence of a fence of convenience and a neighborly accommodation and found that Boot Ranch had failed to meet that burden. Based on these findings, the court concluded that Boot Ranch's use of the disputed property was permissive, which defeated its adverse possession claim.

[¶22] On Boot Ranch's motions, the district court stayed entry of its ruling and certified it as final pursuant to W.R.C.P. 54(b). Boot Ranch timely appealed.

## STANDARD OF REVIEW

[¶23] Our standard of review following a bench trial is as follows:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In considering a trial court's factual findings, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law. The district court's conclusions of law are reviewed de novo.

*Tuckness v. Town of Meeteetse*, 2024 WY 42, ¶ 11, 546 P.3d 1091, 1093-94 (Wyo. 2024) (quoting *Little Med. Creek Ranch, Inc. v. d'Elia (Little Med. Creek Ranch II)*, 2023 WY 30, ¶ 16, 527 P.3d 856, 863 (Wyo. 2023)).

## *DISCUSSION*

[¶24] An adverse possession claim involves shifting presumptions. *Lyman v. Childs*, 2023 WY 16, ¶ 12, 524 P.3d 744, 751 (Wyo. 2023) (citing *O'Hare v. Hulme*, 2020 WY 31, ¶ 20, 458 P.3d 1225, 1234 (Wyo. 2020)). "A presumption of ownership first rests with the record title holder unless and until the adverse claimant makes out his prima facie case of adverse possession." *Lyman,* 2023 WY 16*,* ¶ 12, 524 P.3d at 751 (citing *Kudar v. Morgan*, 2022 WY 159, ¶ 14, 521 P.3d 988, 993 (Wyo. 2022)). "To establish a prima facie case, the claimant must demonstrate for a period of ten years, 'actual, open, notorious, exclusive and continuous possession of the disputed parcel which is hostile and under claim of right or color of title.'" *Lyman,* 2023 WY 16*,* ¶ 12, 524 P.3d at 751 (quoting *Kudar*, 2022 WY 159, ¶ 15, 521 P.3d at 993).

[¶25] Once a prima facie showing of adverse possession is made, the claimant is entitled to a presumption of adverse possession, and the burden shifts to the record title owner to explain or rebut the claim by showing the claimant's use was permissive. *Lyman*, 2023 WY 16, ¶ 23, 524 P.3d at 753-54 (citing *Kudar*, 2022 WY 159, ¶ 16, 521 P.3d at 993). This showing shifts a heightened burden to the adverse claimant to prove that it provided the record title owner with actual notice that it was claiming ownership of the property, and disavowing its use was permissive. *Lyman*, 2023 WY 16, ¶ 37, 524 P.3d at 756-57.

[¶26] Wagonhound does not challenge the district court's conclusion that Boot Ranch made a prima facie showing of adverse possession, and Boot Ranch does not contend it met the heightened burden of actual notice placed on it once the court found its use was permissive. The sole question before us, therefore, is whether the record supports the court's determination that Boot Ranch's use of the property was permissive.

[¶27] The district court found Boot Ranch's use of the disputed property was permissive on two grounds. First, the court found that the fence enclosing the property into Boot Ranch was a fence of convenience; second, it found that Boot Ranch's use of the property was a result of neighborly accommodation. We address each in turn.

## I. *The evidence does not support a finding that the fence enclosing the disputed property into Boot Ranch was a fence of convenience.*

### A. The Fence of Convenience Doctrine

[¶28] One way to prove a use was permissive is to show that a fence enclosing the disputed property or dividing two properties is a fence of convenience. *Lyman*, 2023 WY 16, ¶ 24, 524 P.3d at 754. A fence kept for convenience does not affect the true boundary between land. *Id*. (citing *Kimball v. Turner*, 993 P.2d 303, 306 (Wyo. 1999)).

8

The placement, type and purpose of a fence are important factors in adverse possession cases. A fence which is intended to be the boundary between properties supports a claim for adverse possession. On the other hand, a fence that is placed in a certain location in order to separate pastures or irrigated meadows from grazing land or because the terrain makes it easier to build the fence in that location rather than on the property line is a fence of convenience. When a fence is located off the property line as a matter of convenience, use by the neighbor is considered permissive and will defeat a claim for adverse possession.

*Helm v. Clark*, 2010 WY 168, ¶ 12, 244 P.3d 1052, 1058 (Wyo. 2010) (citing *Braunstein v. Robinson Fam. Ltd. P'ship, LLP*, 2010 WY 26, ¶ 18, 226 P.3d 826, 833-34 (Wyo. 2010)).

[¶29] In *Lyman*, we upheld a district court conclusion that a fence was one of convenience. 2023 WY 16, ¶ 25, 524 P.3d at 754. The sole question with respect to the fence was whether the evidence supported the determination that the fence had been located to avoid difficult terrain on the legal boundary. *Id*. In addressing that question, we summarized from our prior cases the factors a court may consider in determining whether a fence was one of convenience. *Id*. Those factors, which we described as neither dispositive nor exhaustive, included:

- The physical appearance of the fence;
- Whether the fence meanders or runs in a straight line;
- Whether the fence avoids obstacles and natural barriers;
- Whether trees, bushes, or natural objects are used as fencing material;
- Whether there was an obvious lack of intent strictly to follow platted or government description property lines;
- Changes in elevation on the deeded boundary compared to the fence line;
- Soil conditions or rockiness of the deeded boundary compared to the fence line;
- Ease of labor/cost of fencing the deeded boundary compared to the fence line; and
- The type of land the fence is dividing.

*Id*.

9

[¶30]   In evaluating the fence in the case now before us, the district court found there was insufficient evidence to show the fence was built in its present location to avoid difficult terrain on the legal boundary.[5] The court nonetheless focused on the *Lyman* factors and concluded based on those factors that the fence was one of convenience. Before turning to our review of that ruling, it is helpful to set out the holdings in some of our cases that have drawn the distinction between boundary fences and those of convenience, including the cases from which the *Lyman* factors were drawn. These holdings illustrate the extent to which the *Lyman* factors, and particularly the physical characteristics of a fence, guide or influence the determination of whether a fence is a boundary fence or one of convenience.

[¶31]   In *Helm*, a dispute arose between adjoining landowners in 2007 when one of them attempted to relocate a fence to the recorded property line. 2010 WY 168, ¶ 5, 244 P.3d at 1056. In considering whether the existing fence was a boundary fence or one of convenience, the district court found that the land on either side of the fence was similar in nature and that the fence ran in more or less of a straight line but meandered through wooded areas. *Id.*, ¶ 13, 244 P.3d at 1058. The court found the fence incorporated natural materials but was substantial in that it incorporated five barbed wires; that it required maintenance in the spring; and that it was in "the normal condition of a longstanding fence enclosing pasturelands that are located in standing timber and subject to heavy snows." *Id*. It further found that the fence had been constructed in 1920 and

> [i]t was assumed to be on the surveyed line until about 1968. It is typical of the boundary fences that the Helms and Clarks had even though it may not have been built to modern standards. From 1968 onward the Plaintiffs Helms were aware the Clarks were possessing their property on the other side of the fence yet they failed to take action to stop this possession.

*Id.*, ¶ 14, 244 P.3d at 1058-59.

[¶32]   Based on these findings, the district court concluded the fence was a boundary fence. *Helm*, 2010 WY 168, ¶ 13, 244 P.3d at 1058-59. We upheld the court's ruling, *Id.*, ¶ 2, 244 P.3d at 1055, holding that it is the placement, type and purpose of a fence that governs its effect on an adverse possession claim. *Id.*, ¶ 12, 244 P.3d at 1058. We explained:

---

[5] In so concluding, the district court rejected Dustin Ewing's testimony that the fence was built in a more convenient and cost-effective location. The court concluded Mr. Ewing had "no definitive explanation as to why the fence was built where it was[,]" and it gave his opinion "little to no weight."

A fence which is intended to be the boundary between properties supports a claim for adverse possession. On the other hand, a fence that is placed in a certain location in order to separate pastures or irrigated meadows from grazing land or because the terrain makes it easier to build the fence in that location rather than on the property line is a fence of convenience. When a fence is located off the property line as a matter of convenience, use by the neighbor is considered permissive and will defeat a claim for adverse possession.

*Id*.

[¶33]   In *Cook v. Eddy*, a fence dividing adjacent properties departed from the legal boundary and enclosed over forty acres of Mr. Cook's land inside Mr. Eddy's pasture. 2008 WY 111, ¶ 4, 193 P.3d 705, 707-08 (Wyo. 2008). Mr. Eddy had grazed his cattle on those forty acres for over ten years when Mr. Cook began to build a fence on the true boundary. *Id*. In the ensuing dispute, the district court considered whether the existing fence was a boundary fence or one of convenience. *Id.*, ¶ 10, 193 P.3d at 709. It found that there was an old path or corridor along the correct boundary; the existing fence departed severely from the boundary in an obvious way; there were small deviations to accommodate trees or rocks, but the fence generally ran straight in its three sections; and generally, the route of the fence was as irregular as the legal boundary. *Id*. Based on those findings, the court found the fence to be a boundary fence. *Id*. We found no clear error in that determination despite evidence that the fence deviated slightly from a true course and used trees as fence posts. *Id.*, ¶ 16, 193 P.3d at 711.

[¶34]   In *Addison v. Dallarosa-Handrich*, we upheld the district court's conclusion that a fence enclosing over six acres of the record title owner's property was one of convenience. 2007 WY 110, ¶ 21, 161 P.3d 1089, 1093 (Wyo. 2007). The evidence showed that the fence was built when the land was under common ownership and was constructed to separate a calving pasture. *Id*. Additionally, the evidence showed the fence was in poor condition, consisting in places of only posts with no wire, and it followed the topography rather than a straight line. *Id.*, ¶ 20, 161 P.3d at 1093. These factors indicated the fence was intended to be one of convenience rather than one that marked the boundary, precluding an adverse possession claim. *Id.*, ¶ 21, 161 P.3d at 1093.

[¶35]   *Lake v. Severson* reached the same result. 993 P.2d 309, 310 (Wyo. 1999). In that case the evidence showed the fence at issue was built when the land was under common ownership and was built to divide grazing and farming land and to keep livestock off the farmland. *Id*. The evidence also showed that the adverse possession claimant knew the fence was not on the legal boundary and used the property up to the fence only because it was easier than building a new one. *Id*. at 312. We upheld the district court's conclusion

that the fence was one of convenience and therefore defeated the adverse possession claim. *Id.* at 313.

[¶36]  In *Kimball*, the district court likewise ruled that a fence was one of convenience. 993 P.2d at 304. The court found:

> To call the structure a fence is generous. It consists of 3 wires meandering between trees, bushes, and fence posts in an irregular fashion. It appears from the physical appearance that someone walked in the east-west direction stringing barbwire from tree to tree, placing fence posts when trees or bushes were not available.

*Id.* at 306.

[¶37]  The district court further found the fence followed an irregular course and it would be obvious "[e]ven to a casual observer" that it was not on the legal boundary. *Kimball*, 993 P.2d at 306. We upheld the court's conclusion that the fence was one of convenience based on its findings and based on additional evidence that the predecessors in interest never intended the fence to be a boundary fence and instead used it to keep cattle separate. *Id.* at 306-07. We also considered evidence of how the parties currently used the property, with the record title owner freely going back and forth on the disputed property. *Id.* at 307.

[¶38]  In *Mader v. Stephenson*, the Court upheld a district court determination that a fence was a boundary fence. 501 P.2d 1253 (Wyo. 1972). No one who testified knew who had built the fence or when, but it was undisputed that the adverse possession claimant had always occupied and used all the lands on her side of the fence, while the record title owners had always occupied and used all the lands on their side of the fence. *Id.* at 1254. Additionally, the claimant testified she always understood the fence to be the property line and always exercised ownership on her side of the fence. *Id.* at 1255. In upholding the district court's ruling, the Court observed:

> There is an absence of proof in the instant case that the fence in question was built as a fence of convenience; and certainly appellants cannot claim conclusive proof that the fence was built as a fence of convenience, with the parties knowing and agreeing that it was for convenience and not on the true line.

*Id.* at 1254.

[¶39]  What we draw from these holdings is that the *Lyman* factors are not, as we said in *Lyman*, necessarily dispositive in and of themselves. Instead, they guide the

determination of whether a fence is a boundary fence or one of convenience when they tell us something about the purpose of the fence. The *Lyman* factors were relevant to the issue in that case, which was whether the fence qualified as a fence of convenience because the topography made it difficult to build a fence on the boundary. Those factors are less relevant when the convenience is operational; such as separating a calving pasture, as in *Addison*; dividing grazing and farming land, as in *Lake*; or separating cattle, as in *Kimball*.

[¶40]  This focus on the what the physical characteristics of a fence tell us about its purpose is apparent in other cases as well. In *Helm* we recognized that when a court considers differences in the land on either side of a fence, its aim is not just to identify those differences but also the purpose of separating the lands. 2010 WY 168, ¶ 12, 244 P.3d at 1058 ("[A] fence that is placed in a certain location in order to separate pastures or irrigated meadows from grazing land . . . is a fence of convenience."). Similarly in *Cook*, it was not enough that there were obvious angles in the fence or that it meandered and used natural materials; the district court looked to the reason for those characteristics. 2008 WY 111, ¶ 10, 193 P.3d at 709. When it found "the route of the fence is across as irregular of terrain as the route of the correct boundary[,]" it was unable to find a convenience evidenced by the physical characteristics, and concluded the fence was a boundary fence. *Id*.

[¶41]  Our review of these cases further instructs, as we also said in *Lyman*, that the *Lyman* factors are not exhaustive, and there are other relevant considerations. For example, if it is known, the intent of the party who built the fence is relevant. *Addison*, 2007 WY 110, ¶ 21, 161 P.3d at 1093 (considering evidence that land was originally under common ownership and the owner built the fence intending only to separate calving pasture). Also relevant is how the parties historically treated the property separated by the fence and how they currently treat it. *Lyman*, 2023 WY 16, ¶ 31, 524 P.3d at 755 (considering evidence that record owner moved freely between properties without seeking permission); *Kimball*, 993 P.2d at 307 (considering evidence original and current record owners freely went back and forth on disputed property); *Mader*, 501 P.2d at 1254 ("[I]t is not disputed plaintiff had always occupied and used all of the lands on her side of the fence; and the Maders had always occupied and used all of the lands on their side of the fence.").

[¶42]  All these considerations return us to the basic premise underlying the fence of convenience doctrine. It is a means to show that an adverse possession claimant's use of disputed property was permissive. *Lyman*, 2023 WY 16, ¶ 25, 524 P.3d at 754 ("When a fence is located off the property line as a matter of convenience, use by the neighbor is considered permissive and will defeat a claim for adverse possession.") (quoting *Helm*, 2010 WY 168, ¶ 12, 244 P.3d at 1058). If the evidence fails to support a finding of convenience served by the fence, the presence of the fence will not be evidence of permissive use. *Gillett v. White*, 2007 WY 44, ¶ 18, 153 P.3d 911, 916 (Wyo. 2007)

13

(rejecting record owner's fence of convenience argument where she failed to present evidence of a convenience served by fence).

[¶43] With this framework, we turn to our review of the district court's ruling that Wagonhound met its burden of showing the fence enclosing the disputed property was a fence of convenience.

## B.    District Court's Fence of Convenience Ruling

[¶44] As noted, the district court started its analysis with a finding that there was insufficient evidence to show it was easier to build the fence where it was located than on the legal property line. The court then considered the physical characteristics of the fence.

> The location of the fence bordering the Subject Property follows the high-water level of the Reservoir. . . Although the physical appearance of the fence, in many places, is that of a reasonably built cow fence, in several locations, including the northern area, the fence is in disrepair. Furthermore, the fence clearly meanders and does not run in a straight line; in fact, the fence changes directions over 32 times. Even Shane Cross acknowledges that the fence is not straight, uses elements such as trees and rocks as part of the fence, does not follow the record title description, and divides land where the Reservoir is located from grazing ground. While some of the directional changes can be explained, the fence avoids, in several places, obstacles and natural barriers.

[¶45] Based on these physical characteristics, the district court concluded the fence was one of convenience rather than a boundary fence. The flaw in this conclusion is that the court made no findings that would link the physical characteristics of the fence to convenience. Contrary to the dissent's contention, we do not reweigh the district court's fact findings; we simply conclude that the core finding, what convenience the fence served, is absent from the evidence and the district court's findings. In fact, the evidence would suggest the opposite. Shane Cross testified that the reservoir is one of its water sources for Boot Ranch cattle, yet the fence separates Boot Ranch's grazing land from a substantial portion of reservoir. And it is inconceivable that the fence was a convenience to Tomahawk Ranch when it was built since it excludes Tomahawk cattle from forty acres of grazing land. Without evidence of the reason for the fence, operational or otherwise, the physical existence of the fence alone does not support a finding that it was a fence of convenience. *Lyman*, 2023 WY 16, ¶ 25, 524 P.3d at 754 (purpose of fence to avoid difficult terrain on boundary); *Addison*, 2007 WY 110, ¶ 21, 161 P.3d at 1093

(purpose of fence to separate calving pasture); *Lake*, 993 P.2d at 312 (purpose of fence to create barrier between grazing and farmlands).[6]

[¶46]  The district court also found evidence of a remnant fence near the true boundary significant. It reasoned (record cites omitted):

> Mr. Neumiller surveyed and investigated the Existing Fence and the "remnant" fence. Mr. Neumiller could not definitively say whether the "remnant fence" was ever truly a fence or something else, but the evidence tends to show there was, at one point, a fence along the property line. Nobody knows who built the fence, when it was constructed, or whether it was placed on the boundary. However, according to Mr. Neumiller, the "deed line" of the property follows the "remnant fence" line and not the existing fence line. Considering the evidence of remnants of a fence on the actual property line, coupled with the actual location of the existing fence compared to the property line, the evidence shows a lack of intent to follow the boundary line.

[¶47]  The district court's inference of intent from the remnant fence is untenable and, in this case, not particularly helpful in determining whether this was a fence of convenience. First, as the court recognized in its analysis, no one knew if the remnants were from a fence at all, let alone a boundary fence. But even if we were to accept the remnants were evidence of a boundary fence at some point in time, the court's reasoning assumes that whoever built the existing fence knew of the remnant fence and understood it was on the legal boundary. This is speculation and assumes too much. Moreover, this speculative intent sheds no light on the convenience this fence was intended to provide. The building of a fence off the boundary, even knowingly, does not render the use of the enclosed property permissive unless there is a showing of some convenience the fence was intended to serve.

[¶48]  The absence of evidence of a convenience served by the fence enclosing the disputed property makes this case more like *Mader*, and less like our cases that focus on the physical characteristics of the fence. In *Mader*, no one who testified knew who built the fence enclosing the property or when. 501 P.2d at 1254. There was an absence of evidence that the fence was built as a convenience, and the Court therefore looked to how

---

[6] That the fence follows the high-water line likewise in itself provides no evidence of a convenience served by the fence. Because the record contains no evidence of who built the fence or when, we can only speculate as to why it follows the high-water line, including the possibility that whoever built the fence believed that to be the true boundary.

the parties had used the property that was separated by the fence. *Id*. Because the parties had used only the property on their side of the fence, the Court concluded the fence was a boundary fence. *Id*.

[¶49] This case is much the same. There is no evidence of a convenience the fence enclosing the disputed property was intended to serve, only speculation. Additionally, the evidence was undisputed that since at least as early as 1984, Tomahawk Ranch exclusively used the land on its side of the fence, and Boot Ranch exclusively used the land on its side of the fence. The location of the fence in this case thus provides no basis to conclude that Boot Ranch's use of the disputed property was permissive, so Boot Ranch's prima facie case of adverse possession stands.

## II.    *The evidence does not support a finding of neighborly accommodation.*

[¶50]   The district court concluded that Boot Ranch and Tomahawk Ranch had a practice of neighborly accommodation that further indicated Boot Ranch's occupation and use of the disputed property was permissive. In support of this conclusion, the court made the following findings (record citations omitted):

> 44. Shane Cross testified that when Tomahawk Ranch cattle strayed onto the Boot Ranch, he would either contact Diemer True to come get his cattle or put his cattle through the fence and back onto the Tomahawk Ranch.
>
> 45. When Boot Ranch Cattle went onto the Tomahawk Ranch, Diemer True's employees would gather the Boot Ranch cattle and put them into a corral until Shane Cross could retrieve them.

[¶51] Neighborly accommodation is another subset of permissive use. "Neighborly accommodation defeats a claim of adverse possession because 'when a landowner allows a neighbor to use his land, that use should be deemed permissive.'" *Sellers v. Claudson*, 2024 WY 69, ¶ 22, 550 P.3d 559, 568 (Wyo. 2024) (quoting *Galiher v. Johnson* (*Galiher I*), 2017 WY 31, ¶ 22, 391 P.3d 1101, 1106 (Wyo. 2017)). "Neighbors, unlike strangers, normally have some sort of social relationship or contact, whether friendly or otherwise, and will often 'allow slight intrusions onto their land by their neighbors in order to promote good will and avoid bad feelings and confrontations.'" *Sellers,* 2024 WY 69, ¶ 22, 550 P.3d at 568.

[¶52] "Permission requires acts of commission, not omission." *Id.* (citing *Kudar*, 2022 WY 159, ¶ 29, 521 P.3d at 996). "A 'neighborly accommodation' simply cannot be assumed—there must be evidence of communication or joint activity which demonstrates

16

such an accommodation." *Sellers,* 2024 WY 69, ¶ 22, 550 P.3d at 568 (quoting *Kudar*, 2022 WY 159, ¶ 29, 521 P.3d at 996).

[¶53]  The record contains no evidence that anyone from Tomahawk Ranch at any time gave Boot Ranch permission to use the disputed property, and it contains no evidence that Tomahawk Ranch and Boot Ranch at any time operated jointly on the disputed property. *See Sellers*, 2024 WY 69, ¶ 24, 550 P.3d at 568 ("It is well established that a landowner's passive acquiescence to another's use of his land is not evidence of permissive use.") (quoting *Kudar*, 2022 WY 159, ¶ 29, 521 P.3d at 996). Beyond that, we do not see how each ranch removing the other's trespassing cattle could be evidence of a neighborly accommodation. If those actions reflect anything, they were assertions of exclusive ownership and dominion over the property. The district court's finding otherwise was clearly erroneous.

## *CONCLUSION*

[¶54]  The record contains no evidence of a convenience served by the fence enclosing the disputed property, and the evidence likewise did not support the court's finding of a neighborly accommodation. The court thus erred in concluding that Wagonhound had rebutted Boot Ranch's prima facie case of adverse possession with a showing of permissive use. We therefore reverse and remand for entry of an order quieting title to the disputed property in Boot Ranch.[7]

---

[7] Boot Ranch also claimed the district court erred in striking its demand for a jury trial. Because we reverse on other grounds, we do not address that issue.

17

**FENN, Justice**, dissenting.

[¶55] While I concur in the majority's discussion of the law regarding a fence of convenience in our jurisprudence on adverse possession, I disagree with the majority's conclusions. In conducting our appellate review, we do not reweigh the evidence; however, this is exactly what the majority has done. Instead of assuming the evidence of Wagonhound, the prevailing party, is true and giving it every favorable inference fairly and reasonably drawn from the evidence, as required by our standard of review, the majority discounts the evidence in its entirety. *Tuckness*, 2024 WY 42, ¶ 15, 546 P.3d at 1094 (quoting *Little Med. Creek Ranch II*, 2023 WY 30, ¶ 16, 527 P.3d at 863) ("We are required to 'assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.'").

[¶56] Boot Ranch challenges the district court's finding the fence enclosing the disputed property is a fence of convenience. Thus, the issue before this Court is whether the district court's finding regarding the existing fence is clearly erroneous. *Kimball*, 993 P.2d at 306; *Hillard v. Marshall*, 888 P.2d 1255, 1260 (Wyo. 1995). Upon review of the record, there is sufficient evidence supporting the district court's conclusion the existing fence is a fence of convenience and not a boundary fence.

[¶57] The majority finds there is an absence of evidence regarding a convenience served by the fence enclosing the disputed property. It relies on *Mader v. Stephensen*, a case where the only evidence available of any convenience was testimony stating "perhaps [the appellee's] father had built the fence[]" three feet inside the property line because that was his habit when building a fence. 501 P.2d at 1254. Unlike the evidence in *Mader*, there is more than speculative testimony supporting the district court's factual conclusion in this case.

[¶58] In *Mader*, this Court reiterated "even if plaintiff's evidence may have been contradicted in some respects, we will not retry the case or disturb findings of fact by the trial court[]" regarding findings of a fence of convenience. 501 P.2d at 1254. Here, although there is contradictory evidence supporting a finding the existing fence is a boundary fence, there is sufficient evidence supporting the district court's factual conclusions. The existing fence follows the high-water mark of the reservoir, and there are remnants of another fence along the actual boundary line, which are similar to the fencing materials used to build the existing fence.

[¶59] In *Hillard v. Marshall*, an owner split land with her brother and a fence was later built to separate the two parcels. 888 P.2d 1255, 1258 (Wyo. 1995). Seventy-one years later, it was discovered the fence was not built along the property line. *Id.* The district court found the fence was built in its location rather than along the property line because of the terrain and thus concluded it was more convenient to place the fence where it was. *Id.* at 1260. The only evidence supporting this finding was "from a surveyor who had

observed the terrain and from other testimony that showed that the fence followed the property line in other areas, implying that the people who built the fence knew where the property line was located." *Id.* The surveyor described the lay of the land and concluded the fence was placed off the property line because of the topography. *Id.* at 1259.

[¶60] In *Hillard*, there was no testimony about who built the fence, why it was built off the property line, or from someone who said the fence was built along what was believed to be the property line. Nevertheless, we agreed the evidence was sufficient for the trial court to conclude the evidence implied a finding that whoever built the fence knew where the property line was located, and the fence was built for convenience. *Id.* The appellant argued the evidence from the surveyor was not enough to rebut a prima facie case of adverse possession. *Id.* at 1260–61. The appellant claimed he adversely possessed the land on his side of the fence by grazing cattle on the land, which was not suitable for any other purpose. *Id.* Although this was how the appellant used the land on his side of the fence, we found the district court's finding of a fence of convenience based on the terrain of the land was not clearly erroneous, and the appellant's use of the land to graze cattle was permissive. *Id.*; *see also Kimball*, 993 P.2d at 306 (quoting *Hillard*, 888 P.2d at 1261) (discussing a fence built simply for convenience has no effect upon the true boundary between tracts of land because a fence of convenience creates a permissive use).

[¶61] In *Rutar Farms & Livestock, Inc. v. Fuss*, there was testimony of the existence of two fences. 651 P.2d 1129, 1133 (Wyo. 1982). One fence was built on a line dividing the appellants' land of record from the appellees' land of record. *Id.* The trial court found the second fence was remnants of a fence in various states of ill repair that was situated along a jagged line roughly parallel to the North Platte River. *Id.* at 1134. On appeal, based on our standard of review, we accepted the district court's finding the first fence was a boundary line fence. *Id.* We also agreed with the district court's ultimate finding that the second fence along the river was not a boundary fence. *Id.* We held "[a]n irregular fence, following the general course of a river and obviously not following what any reasonable person would consider a boundary line, appears to be a fence of convenience or a control fence rather than a boundary fence." *Id.*

[¶62] Based on the authority set forth above, the majority should affirm the district court's finding of a fence of convenience and permissive use under the facts of this case. Here, there are two possible fences, fence remnants along the boundary line and the existing fence following the high-water mark. As to the fence remnants along the boundary line, Dustin Ewing, Wagonhound's ranch manager, testified he noticed a remnant fence or things that looked like lined-up fence posts. Brad Neumiller, a licensed surveyor, testified there were rocks with wire around it along the remnant fence, which in his experience indicates there was a fence there at one point. Both Mr. Neumiller and Shane Cross testified rocks with wire around them are known as anchors or deadmen. Shane Cross testified Boot Ranch currently uses those same deadmen as found along the

19

remnant fence for fence lines on Boot Ranch, including fence lines on legal boundaries. Mr. Neumiller testified as he walked along the remnant fence, he saw wood posts still standing, wood posts on the ground, and steel t-posts. He testified some of these remnants were in places close to the boundary line.

[¶63] As to the second fence, identified as the existing fence, Mr. Neumiller, Mark Norem, and Shane Cross all testified the existing fence follows the high-water mark and does not run along the boundary line. Mr. Neumiller testified the existing fence is a four-strand barbed wire fence built of t-posts and wood that is sometimes tied into existing rocks and trees. He stated the existing fence does not run in a straight line and meanders like it's following along something. Mr. Norem testified the existing fence does not run in a straight line and it meanders a lot because "[i]t's pretty obvious it's the water level of the reservoir [that] had something to do with where they put the fence." Mr. Norem further testified the existing fence avoids natural obstacles and uses trees to brace the fence, as well as rocks to hold down the fence. Richard Cross testified the existing fence does not run in a straight line and avoids obstacles, such as rocks, trees, and other rough terrain.

[¶64] Dustin Ewing and Shane Cross both testified the water level of the reservoir fluctuates. Shane Cross testified Boot Ranch put in panel fences that are only exposed based on the water level of the reservoir. He also testified there is a road that terminates into the reservoir, and the road becomes more visible depending on the water level.

[¶65] Whether the existing fence is a boundary fence or merely a fence of convenience is a question of fact that must be addressed by the district court. *Graybill v. Lampman*, 2014 WY 100, ¶ 40, 332 P.3d 511, 523 (Wyo. 2014); *Hillard*, 888 P.2d at 1260. As we have continually reiterated, we do not set aside the district court's findings following a bench trial even if we might have reached a different conclusion. *Rutar Farms & Livestock, Inc.*, 651 P.2d at 1133; *Doenz v. Garber*, 665 P.2d 932, 937 (Wyo. 1983). Based on the entire record, I am not left with a definite and firm conviction the district court's findings are mistaken or unsupported. There is sufficient evidence supporting the existing fence was built out of convenience along the high-water mark of the reservoir. The existing fence was not built in a straight line and instead meandered along the course of the high-water mark of the reservoir, which was known to fluctuate in its water level, and avoided obstacles and other rough terrain. Additionally, the remnant fence located along parts of the boundary line still had wooden posts that remained standing and contained similar anchors or deadmen as those used in the existing fence. This evidence, when viewed in a light favorable to Wagonhound, supports a reasonable inference that those who built the existing fence knew the fence was not built along the boundary and instead was built out of convenience for the purpose of following the reservoir along the high-water mark. Based on the foregoing, I would find the record reasonably supports the district court's factual finding the existing fence was built out of convenience and would affirm the decision.