# IN THE SUPREME COURT, STATE OF WYOMING

# 2026 WY 42

**APRIL TERM, A.D. 2026**

**April 15, 2026**

| | |
|---|---|
| ERNEST ANDERSON and MARTHA ANDERSON, | |
| Appellants (Defendants/Third-Party Plaintiffs), | |
| v. | |
| NOAH MESSINGER and BRANDY CHAPLIN, | |
| Appellees (Plaintiffs), | S-25-0134, S-25-0170 |
| and | |
| WYOMING FALL CREEK, LLC, a Wyoming limited liability company, | |
| Appellee (Third-Party Defendant). | |
| | |
| WYOMING FALL CREEK, LLC, a Wyoming limited liability company, | |
| Appellant (Third-Party Defendant), | |
| v. | S-25-0135, S-25-0169 |
| ERNEST ANDERSON and MARTHA ANDERSON, | |

Appellees
(Defendants/Third-Party Plaintiffs),

and

NOAH MESSINGER and BRANDY
CHALIN,

Appellees
(Plaintiffs).

*Appeal from the District Court of Teton County*
*The Honorable Richard L. Lavery, Judge*

*Representing Ernest and Martha Anderdon:*
>    Matt Kim-Miller, Barack Ferrazzano Kirschbaum & Nagelberg, LLP, Jackson, Wyoming. Argument by Mr. Kim-Miller.

*Representing Noah Messinger and Brandy Chaplin:*
>    Ed Bushnell, Bushnell Law Office; Heather Noble, Jackson, Wyoming. Argument by Mr. Bushnell.

*Representing Wyoming Fall Creek:*
>    Anna Reeves Olson, Long Reimer Winegar, LLP, Casper, Wyoming; Neal R. Stelting and Isaiah R. Gross, Stelting & Gross, LLC, Jackson, Wyoming. Argument by Ms. Reeves Olson.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, JAROSH, and HILL, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Chief Justice.**

[¶1]    Ernest and Martha Anderson contracted to sell their home to Noah Messinger and Brandy Chaplin.[1] Wyoming Fall Creek, LLC (WFC) owned the neighboring property and held a first right of purchase for the Andersons' property. As the Andersons' contract with Mr. Messinger approached closing, WFC at times expressed that it intended to exercise its purchase right, but never reached an agreement with the Andersons. The Andersons' contract with Mr. Messinger did not close. As a result of litigation between all three parties, the district court ordered the Andersons to sell their home to Mr. Messinger and found WFC tortiously interfered with Mr. Messinger's contract with the Andersons. It also ordered WFC and the Andersons to pay Mr. Messinger's attorney fees and costs. The Andersons appeal, arguing they did not breach their contract with Mr. Messinger and thus the district court erred in awarding specific performance. WFC also appeals, arguing the district court erred in finding it tortiously interfered with Mr. Messinger's contractual rights, and that its award of attorney fees as punitive damages is unconstitutional. We affirm.

## *ISSUES*

[¶2]    We restate and consolidate the issues as follows:

1. Did the district court err in ordering the Andersons to specifically perform their contract with Mr. Messinger?

2. Did the district court err in holding WFC liable for tortious interference with Mr. Messinger's contract with the Andersons?

3. Was the district court's punitive damages award against WFC unconstitutional?

## *FACTS*

### *Background*

[¶3]    In 1976, the owners of Lots 4A and 4B of the Country Estates in Teton County, Wyoming, recorded a set of covenants burdening the two properties. In addition to

---

[1] Mr. Messinger and Ms. Chaplin are married. For brevity, and as the parties and the district court at times did below, we will treat references to Mr. Messinger as references to Mr. Messinger and Ms. Chaplin collectively.

various restrictions regarding the use of the two properties, the covenants provide each lot owner a "first right of purchase"[2] over the other:

> Each property owner has first right of purchase of the other's property as named in these covenants. Clarification: If either said property is offered for sale for a stated price, but is subsequently lowered at a future date, this new price must be offered to the said landowner. Terms of acceptance of sale of said property must be agreed upon within 60 days after property is offered for sale.

[¶4]  In 2005, the Andersons purchased Lot 4B from Jan and Clinton Kew. Their purchase led to litigation between the Kews and the neighboring owner of Lot 4A, Robert Baltensperger, with Mr. Baltensperger claiming the sale violated his first right of purchase. The Andersons were co-defendants in that case because they were the record owners of the property at that point. The district court ruled in favor of the Kews.

[¶5]  In 2014, Mr. Baltensperger received an offer on Lot 4A and notified the Andersons in accordance with their first right of purchase. The Andersons waived their right with respect to that sale, but the buyer could not obtain financing. Mr. Baltensperger eventually received another offer from WFC, an LLC whose sole member is John Boerschig, a rancher and real estate investor from Texas who is also a licensed attorney. The Andersons again waived their first right of purchase, and WFC purchased Lot 4A.

[¶6]  Between 2014 and 2017, the Andersons and Mr. Boerschig discussed the possibility of the Andersons selling Lot 4B to WFC several times. The Andersons rejected an offer from WFC to purchase the property in 2015 because they felt the offer was too low. In 2016, the Andersons engaged a realtor, Doug Herrick, to help them sell their property. In 2017, they informed WFC they were listing the property for $699,000.

### The Purchase Agreement and the first right of purchase period

[¶7]  The Andersons listed the property for $699,000. The listing disclosed the existence of the first right of purchase. Mr. Messinger saw the listing and visited the property in early August of 2017. Following negotiations, he and the Andersons agreed to a purchase price of $657,000.

---

[2] Below, the parties referred to this right interchangeably as a "first right of purchase," a "right of first purchase," and a "right of first refusal." The differences in these terms may have practical implications. *See* Joshua Stein, *It Seemed Like a Good Idea at the Time: Rights of First Offer and First Refusal*, 30 No. 2 Prac. Real Est. L. 43, 45–46 (2014) (comparing common understandings of the terms "right of first offer" and "right of first refusal"). Those implications are not relevant here, and we will use the term "first right of purchase" to match the covenant language.

[¶8]  On August 23, 2017, Mr. Messinger and the Andersons executed a Contract to Buy and Sell Real Estate (the Purchase Agreement).[3] Attachment A, incorporated into the Purchase Agreement by reference, provides that "Buyers acknowledge that there is a 60 day (from acceptance of this offer) first right of refusal with the owners of Lot 4, Country Estates." The Purchase Agreement required the Andersons to provide a title insurance commitment to Mr. Messinger by September 5, 2017, and provide a title insurance policy "without unreasonable delay after closing and pay the premium thereon at the time of closing." It also provided that "[t]itle shall be merchantable in Seller," but "subject to general taxes for the year of closing, local improvement districts, guaranteed revenues to utility companies, building and zoning regulations, city, county and state subdivision and zoning laws, easements, restrictive covenants, and reservations of record[.]" It required the Andersons to execute and deliver a general warranty deed. The Purchase Agreement allowed Mr. Messinger until September 30, 2017 to review existing covenants, the commitment for title insurance, and various physical aspects of the property. It further provided that if Mr. Messinger gave written notice of "dissatisfaction or inability to satisfy a concern, contingency, and/or due diligence matter(s) on or before September 30, 2017," the Purchase Agreement would automatically terminate. If Mr. Messinger did not provide such notification, the agreement was to remain in full force. Finally, the agreement set closing for "the 62nd day after acceptance of this offer or sooner" to account for the 60-day period WFC had to exercise its first right of purchase.

[¶9]  On August 22, 2017, the Andersons emailed Mr. Boerschig's assistant and informed him of their agreement with Mr. Messinger. Through his assistant, Mr. Boerschig requested a copy of the terms of the Purchase Agreement, which the Andersons provided. On August 25, the Andersons followed up and confirmed with the assistant that Mr. Boerschig had received a copy of the Purchase Agreement and was reviewing it, but was also preparing for a hurricane to hit the area in Texas where he lived.

[¶10]  On August 31, 2017, Wyoming Title and Escrow issued a title commitment. It did not specifically list the first right of purchase as an exception to the title commitment, but did provide a general exception for encumbrances and adverse claims of record, as well as a special exception for the 1976 covenants generally. The first right of purchase was also not referenced in the title commitment's list of "requirements," which "must be met and completed to the satisfaction of the Company before its Policy of Title Insurance will be issued[.]"

---

[3] The purchase agreement was dated and prepared on August 21, 2017. However, the parties signed the agreement on August 23.

[¶11] On September 5, 2017, the Andersons reached out to Mr. Boerschig's assistant and requested an update on whether he intended to exercise the first right of purchase. His assistant responded with an email notifying the Andersons "that John Boerschig will be exercising his rite [sic] of first refusal to purchase your home. He will be working with David Viehman on the transaction."[4] On September 11, 2017, the Andersons followed up and informed Mr. Boerschig that they wanted to execute a written contract quickly because "[t]he previous buyer is of course disappointed and in somewhat disbelief." They asked Mr. Boerschig to let them know when he would be sending documents for their review.

[¶12] On September 14, 2017, Mr. Viehman reached out to Mr. Herrick with some questions about the Purchase Agreement. Mr. Viehman explained that Mr. Boerschig "plans to exercise his option to purchase the property, but wants to look into a few things about the contract before pulling the trigger." From this point, communications between the Andersons and WFC became more sporadic. On October 2, 2017, Mr. Herrick emailed the Andersons, requesting them to confirm WFC's first right of purchase expired on October 20 and closing with Mr. Messinger could be scheduled for October 23. The Andersons forwarded the message to Mr. Boerschig's assistant and asked him to let them know "how [he] plan[ned] to proceed with the purchase of [their] home."

[¶13] During this time, Mr. Messinger hoped he might still be able to purchase the property. He sought financing and prequalified for a loan of more than $591,000. He also obtained inspections of the property and agreed to several repairs with the Andersons. Mr. Messinger also remained in contact with Mr. Herrick about the status of WFC's exercise of its first right of purchase.

[¶14] At some point, Ms. Anderson needed to go to Wyoming Title and Escrow's office to provide information for closing with Mr. Messinger. She testified she made small talk with "one of the gals there" and at one point said "we'll see who steps up and buys the property." While nobody at the office said anything in response to her comment, she testified there was "an uncomfortable pause," and her notes and testimony reveal that she believed her comment led to the following email from Wyoming Title and Escrow to Ms. Anderson, Mr. Messinger, Mr. Herrick, and several individuals at Mr. Messinger's prospective mortgage company:

> Good afternoon Everyone,
>
> Attached is a revised [title commitment] with a requirement (#11) to record a release of the right of first refusal.

---

[4] Mr. Viehman is a real estate agent in Jackson, Wyoming and had acted as Mr. Boerschig's real estate agent in prior transactions.

Title reviewed the CCRs with our underwriter and the underwriter would in fact like an executed release recorded.

Please let me know if you would like me to contact the neighbor, provide the document as well as a return FedEx label.

I'm happy to help in anyway [sic].

Please let me know of any questions.

Thank you!

The attached updated title commitment added a new "requirement" of a "waiver, cancellation, or release of the Right of First Refusal" and updated the special exception regarding the 1976 covenants to specifically acknowledge the "Right of First Refusal as shown in paragraph No. 26."

[¶15]  Ms. Anderson responded and requested Wyoming Title and Escrow not contact WFC, later explaining she wanted to speak with Mr. Herrick first. On October 13, 2017, the Andersons again contacted Mr. Boerschig's assistant and requested he prepare an agreement, explaining the first right of purchase would soon expire and closing with Mr. Messinger was scheduled for October 23.

[¶16]  Around this time, Mr. Herrick had been in contact with Mr. Messinger. Mr. Herrick informed Mr. Messinger that Mr. Boerschig might be interested in amending the 1976 covenants as an alternative to purchasing the property. On October 17, Mr. Boerschig wrote a letter to Mr. Messinger offering to "forego [WFC's] right of first refusal" in exchange for various amendments to the covenants. The proposed amendments were numerous and would have revised many of the requirements relating to building size and other physical restrictions on Lots 4A and 4B. Mr. Messinger did not agree to most of the amendments and hired an attorney to respond to Mr. Boerschig. Mr. Messinger's attorney rejected Mr. Boerschig's offer and in return offered to remove only the first right of purchase covenant in exchange for Mr. Boerschig's waiver. Mr. Boerschig's assistant responded shortly thereafter, explaining Mr. Boerschig's position was "either the covenants are amended as he specified in his letter or the Rite [sic] of First Refusal stays."

[¶17]  With Mr. Messinger's closing date approaching and the status of WFC's first right of purchase unclear, the Andersons and Mr. Messinger twice extended the closing date, ultimately to November 6, 2017. During this time, the Andersons were in frequent contact with Mr. Boerschig. Of note is a phone call the Andersons had with Mr. Boerschig on October 27 where Mr. Boerschig "was upset and behaving erratically" and claimed "the 60-day right of first refusal period [should] restart, but didn't say why." Mr. Boerschig also said he would never buy another piece of property in Teton County

5

again. After this call, the Andersons informed Mr. Messinger's attorney that "[i]t is not our understanding that Mr. Boerschig is exercising his right of refusal." Mr. Messinger requested documentation showing Mr. Boerschig did not plan on purchasing the property. Around this time, the Andersons hired an attorney.

[¶18] The Andersons continued negotiating with WFC, and the closing date of November 6 came and went. At one point, WFC sent the Andersons an addendum to the Purchase Agreement assigning Mr. Messinger's rights to WFC. Mr. Messinger did not agree to an assignment, and so the Andersons provided WFC with a new contract for the Andersons to sell Lot 4B to WFC. When Mr. Messinger learned of the status of the Andersons' negotiations with WFC, his attorney sent an email explaining Mr. Messinger was not willing to exit his contract with the Andersons and he would only consider his contract terminated "if and when the Anderson/Boerschig deal closes[.]" The Andersons interpreted this email as consent for them to negotiate with WFC and continued to do so.

[¶19] The Andersons' negotiations with WFC stalled due to a disagreement over realtor fees. The Andersons did not want to pay Mr. Viehman a commission, but Mr. Viehman felt he was entitled to one. The Andersons eventually offered a lower commission to Mr. Viehman as a compromise, but they never reached an agreement with WFC. Mr. Messinger eventually threatened to sue the Andersons if they did not sue WFC to resolve the status of WFC's right of first refusal, and the Andersons ceased negotiations with WFC.

### *Litigation between the Andersons and WFC*

[¶20] In February of 2018, the Andersons sued WFC. They requested

> Issuance of a declaratory judgment that WFC has waived any right to purchase the Anderson Property on the terms set forth in the Messinger Contract and that the Andersons can proceed to sell the Anderson Property to Messinger at the purchase price of $657,000, free and clear, as to that transfer, of any right of purchase that WFC may have under the Covenants.

[¶21] After about a year of litigation, the Andersons sent Mr. Messinger a letter terminating the Purchase Agreement. The Andersons explained the closing date had passed and Mr. Messinger had not objected to the covenants or taken any other action in accordance with the Purchase Agreement. They reasoned that because Mr. Messinger did not close the Purchase Agreement on the closing date, they had "the right to terminate the contract under the contract's default provisions." They also argued the Purchase Agreement did not require them to litigate with WFC, and it was clear WFC "will seek to litigate this case for years to come, and the Andersons have no interest in pursuing that." Upon learning of the Andersons' termination of the contract, the district court dismissed

6

their action against WFC as moot, since it was no longer possible for the Andersons to seek to complete the sale to Mr. Messinger under the Purchase Agreement.

***The present litigation***

[¶22] Mr. Messinger then sued the Andersons for specific performance of the Purchase Agreement. Mr. Messinger alleged the Andersons had refused to convey the property to him and had thereby breached the Purchase Agreement. He argued the Purchase Agreement entitled him to specific performance and attorney fees and costs. The Andersons answered and also brought a third party complaint against WFC, once again seeking a declaration that WFC no longer had a valid first right of purchase under the covenants. WFC answered and brought several claims of its own: tortious interference with a contract against Mr. Messinger; intentional misrepresentation and negligent misrepresentation against Mr. Messinger; breach of contract and specific performance, or in the alternative, damages, against the Andersons; negligent misrepresentation against the Andersons; and intentional misrepresentation against the Andersons. Mr. Messinger answered and counterclaimed against WFC for tortious interference with a contract.

[¶23] The district court bifurcated the proceedings and ordered separate trials on the contract and tort claims. It included the Andersons' declaratory claim with the contract claims. All claims went to trial. After the contract trial, the district court declared WFC had not timely exercised its first right of purchase, finding "the evidence does not support that WFC did anything to exercise its right of first purchase during the 60 days after the property was offered for sale."

[¶24] The district court also ordered the Andersons to specifically perform under the Purchase Agreement and sell the property to Mr. Messinger. It rejected the Andersons' position that Mr. Messinger breached the Purchase Agreement on November 6, 2017 when closing did not occur as scheduled. It disagreed with the Andersons that Mr. Messinger failed to close as scheduled, instead finding the Andersons were the ones who were unable to close due to the fear of being sued by WFC if they attempted to sell the property to Mr. Messinger. It also determined that under the Purchase Agreement, Mr. Messinger was entitled to attorney fees he incurred in enforcing the agreement. However, it determined he was not entitled to attorney fees he incurred in pursuing other claims.

[¶25] Following the tort trial, the district court found in favor of Mr. Messinger on his tortious interference with a contract claim against WFC, and denied all other remaining claims. It determined WFC's actions constituted intentional and improper interference with Mr. Messinger's rights under the Purchase Agreement. It found WFC did not assert its own interests in good faith, and was instead motivated by a desire to amend the covenants at no cost to itself. The court found Mr. Messinger had proven $57,651.75 in

damages based on the more favorable interest rates that would have been available to Mr. Messinger on a home loan in 2017 compared to those available at the time of trial.

[¶26] Finally, the district court ordered WFC to pay Mr. Messinger's attorney fees and costs. It held WFC jointly and severally liable with the Andersons for Mr. Messinger's fees incurred in enforcing the contract against the Andersons (as well as fees and costs that could not be apportioned), and WFC solely liable for Mr. Messinger's fees associated with pursuit of his tort claims against WFC. It awarded the fees against WFC as punitive damages, finding "WFC's conduct was willful and wanton," and awarding the fees would "discourage future conduct of this nature." All told, the court held the Andersons and WFC jointly and severally liable for $132,215.78 of Mr. Messinger's attorney fees and costs, and WFC solely liable for another $78,865.76.

[¶27] The Andersons and WFC each appealed the judgments and fee awards against them. We previously consolidated each party's two appeals, and after oral arguments consolidated all four appeals for purposes of issuing this opinion.

## DISCUSSION

### I. The district court did not err in ordering the Andersons to specifically perform under the Purchase Agreement.

[¶28] The district court ordered the Andersons to specifically perform their obligations under the Purchase Agreement following a bench trial. We review the district court's ruling after a bench trial under the following standard:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail reweighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. In considering a trial court's factual findings, we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or

8

erroneous as a matter of law. The district court's conclusions of law are reviewed de novo.

*Leeks Canyon Ranch, LLC v. Jackson Hole Hereford Ranch, LLC*, 2025 WY 63, ¶ 31, 569 P.3d 1120, 1130 (Wyo. 2025) (quoting *Boot Ranch, LLC v. Wagonhound Land & Livestock Co., LLC*, 2024 WY 136, ¶ 23, 560 P.3d 887, 893 (Wyo. 2024)).

[¶29]  Specific performance is an equitable remedy and is normally left to the discretion of the district court. *Ruppert v. Merrill*, 2024 WY 113, ¶ 11–12, 558 P.3d 529, 534 (Wyo. 2024). It goes without saying, however, that specific performance is only available when a party breaches a contract. *See id.*, ¶ 12, 558 P.3d at 534 ("[Specific performance] is a means of compelling a contracting party to do precisely what he should have done without being coerced by a court.") (quoting *Davis v. Harmony Dev., LLC*, 2020 WY 39, ¶ 34, 460 P.3d 230, 241 (Wyo. 2020)). The Andersons' primary argument for reversing the district court's specific performance award is that they did not breach the Purchase Agreement. They argue it was instead Mr. Messinger who breached the Purchase Agreement when he did not purchase the property on the closing date of November 6, 2017.

[¶30] The Purchase Agreement imposed obligations on both the Andersons and Mr. Messinger to close the sale:

> Time is of the essence of this contract. Any party who fails to tender any payment and/or perform any other condition hereof as herein provided shall be in default under this contract. In the event Buyer defaults and fails to complete the purchase of the subject property ***without the default of the Seller***, Seller's sole remedy shall be to receive 100% of the Buyer's earnest money deposit as stipulated and liquidated damages, and reimbursement by Buyer of Seller's reasonable legal collection costs. Seller shall not have the right to specifically enforce the terms and conditions of this contract. In the event of default by Seller, the Buyer shall have the right, at Buyer's sole option, to either terminate this contract and recover Buyer's deposit, or to specifically enforce the terms and provisions of this contract.

(emphasis added). The Andersons argue that since Mr. Messinger did not "tender payment" on the closing date and try to force the Andersons to sell, Mr. Messinger breached the Purchase Agreement.

[¶31]  Ordinarily, when time is of the essence in a real estate contract, the buyer must tender payment by showing he is ready, willing, and able to perform his obligations on

9

the closing date. *See Quinlan v. St. John*, 201 P. 149, 150 (Wyo. 1921) ("When it is said that time is of the essence, the proper meaning of the phrase is that the performance by one party at the time specified in the contract or within the period specified in the contract is essential in order to enable him to require performance from the other party.") (quoting earlier edition of 15 Williston on Contracts § 46:2 (4th ed. May 2025 update)); *see also Morningstar v. Robison*, 2023 WY 28, ¶ 25, 527 P.3d 241, 249 (Wyo. 2023) ("The facts plainly establish the existence of a binding and valid contract and they also establish that the [buyers] were ready, willing, and able to purchase the Property, and would have done so but for the [sellers'] refusal to close the transaction.") (citation modified). The Purchase Agreement provides as much. But there are cases where the requirement to tender payment is excused:

> The necessity of a formal tender or demand may be waived or excused by the acts of the other party as by that party's express refusal in advance to comply with the terms of the contract in that respect or where it appears that the other party has placed himself or herself in a position in which performance is impossible or where it appears that the defaulting party is not ready, willing, or able to perform his or her part of the contract. . . . Moreover, there are numerous cases holding that a tender of performance is not necessary where it would be an idle, vain, or useless act.

15 Williston on Contracts § 47:4 (4th ed. May 2025 update) (footnotes omitted). In line with this authority, the Purchase Agreement only allows the Andersons to terminate the contract if the Andersons themselves are not in default. Therefore, Mr. Messinger was not required to show up to closing and tender payment if it was clear the Andersons themselves could not or would not show up and perform.

[¶32]   The district court specifically found the Andersons were not prepared or willing to close with Mr. Messinger on the closing date:

> [Mr. Messinger] didn't unilaterally refuse to close. . . . [The Andersons] didn't want to go forward with the closing while they continued to negotiate with WFC. [The Andersons] knew if they didn't – if they vended the title as-is to [Mr. Messinger] – they would have immediately been sued by WFC. After the covenants 60-day exercise period expired, all parties went along with engagement in settlement negotiations for months to see if it would be possible to resolve matters among WFC, [the Andersons], and [Mr. Messinger].

[¶33] After reviewing the entire record, we conclude this finding was adequately supported by the evidence presented and thus not clearly erroneous. Ms. Anderson testified that in late October and early November, the Andersons "just wanted to get the deal done" and did not care whether they sold the property to Mr. Messinger or WFC. She also testified that she did not believe Wyoming Title and Escrow would have done its part in closing the transaction without a waiver from WFC. In a November 28, 2017 letter from the Andersons' attorney to Mr. Viehman, their attorney explained their position that "[t]he Andersons have a perfectly fine contract in place with Messinger/Chaplin as the buyer[.]" In trying to reach an agreement with WFC in a November 17 email, the Andersons' attorney explained any contract proposal to WFC was "subject to the Andersons obtaining a concurrent termination of the Messinger/Chaplin contract." Mr. Messinger testified that after the several closing dates passed, he understood the Andersons were working on obtaining a waiver from WFC. Finally, Mr. Boerschig testified that WFC would have sued the Andersons had they conveyed the property to Mr. Messinger. The district court aptly characterized the Andersons' position as seeking "a way out, as anyone would, caught as they were between Scylla and Charybdis through no fault of their own. [They] continued to negotiate because they had no way out but negotiation or litigation."

[¶34] Therefore, the district court did not clearly err in finding the Andersons were unable or unwilling to take the risk of trying to convey the property to Mr. Messinger on the scheduled closing date. As shown above, the record supports the conclusion that the Andersons and Mr. Messinger went forward from the unsuccessful closing with the understanding that the Purchase Agreement remained intact.

[¶35] With the Andersons unable to rely on a breach by Mr. Messinger as justification for their actions, their own breach becomes clear. While all parties treated the Purchase Agreement as intact long through the November 6 closing date and the majority of the Andersons' first suit against WFC, the Andersons unilaterally determined in April of 2019 that they had the right to terminate the contract. In their letter to Mr. Messinger, they essentially made the same argument they have maintained through their current appeal: that Mr. Messinger was to blame for the failed closing of the Purchase Agreement. The district court made findings to the contrary, and we have affirmed those findings. Therefore, the Andersons were not justified in unilaterally terminating the Purchase Agreement, and they breached the Purchase Agreement when they did so.[5]

---

[5] The Andersons make a number of arguments that the purchase agreement excused them from any liability or requirement to act in relation to WFC's claims. They argue Mr. Messinger had to accept a warranty deed with exceptions for WFC's claims or forego purchasing the property. We need not resolve these arguments because they are based on an alternative view of the facts. As the district court found and we have affirmed, the Andersons were not prepared to deliver a deed of any kind on the scheduled closing date.

[¶36]   Nonetheless, the Andersons make several additional arguments for reversing the district court's specific performance award. They argue they were not required to sue WFC to make their title merchantable, and the district court's ruling somehow implies they were required to do so. Setting aside the fact that they voluntarily brought their declaratory claim against WFC, this argument is confusing and mischaracterizes the district court's ruling. The district court separately determined: 1) that WFC did not timely exercise its first right of purchase; and 2) that the Andersons could not rely on their incorrect assumption that Mr. Messinger breached the Purchase Agreement to refuse to perform their own contractual obligations. These conclusions are independent of one another. Even in a hypothetical scenario where the Andersons did not pursue declaratory relief against WFC or were unsuccessful in doing so, this would do nothing to change the fact that they breached the Purchase Agreement when they unilaterally terminated it.

[¶37]   The Andersons also argue Mr. Messinger did not demonstrate he had the financial ability to close the Purchase Agreement on the closing date. Even had he not been excused from closing on November 6, Mr. Messinger testified that he pre-qualified for a loan of over $591,000 with an interest rate of 4.125%. Based on this testimony, the district court found "the facts plainly established that [Mr. Messinger was] ready, willing, and able to purchase the property, and had secured financing, per the terms of the contract, to do so." Mr. Messinger could not, however, move forward with the purchase until the first right of purchase issue was resolved and the Andersons were prepared to do their part in closing the sale. The Andersons argue Mr. Messinger's testimony alone is insufficient, and "documentary evidence" of a "binding commitment" for financing was required. They cite no Wyoming authority for this argument, and we have found none. They instead rely on cases from other states. We see no reason to adopt a bright-line rule that a buyer of real property must present documentary evidence that he has the financial ability to purchase real property in order for a trial court to be able to award specific performance. Our standard of review requires us to give Mr. Messinger, as the prevailing party below, every reasonable inference that can be drawn from the evidence. *Leeks Canyon Ranch, LLC*, 2025 WY 63, ¶ 31, 569 P.3d at 1130. Mr. Messinger's credibility was for the district court to weigh in this case, and we cannot say its decision to credit his testimony that he had the financial capacity to purchase Lot 4B was clearly erroneous.

[¶38]   The Andersons breached the Purchase Agreement by unilaterally terminating it without justification in April of 2019. Their arguments to the contrary are unpersuasive and unsupported by the record. We therefore affirm the district court's specific performance award.[6]

---

[6] The Andersons also seek reversal of the district court's attorney fees award against them. However, their only argument for doing so is that if they are successful in their other appellate arguments, Mr. Messinger will no longer be a prevailing party and thus will no longer be entitled to fees under the purchase agreement. We have rejected their other arguments, and thus we affirm the district court's attorney fees award against the Andersons.

## II. The district court did not err in finding WFC intentionally and improperly interfered with Mr. Messinger's rights under the Purchase Agreement.

[¶39] WFC argues the district court erred in finding it tortiously interfered with Mr. Messinger's rights under the Purchase Agreement. Because the district court made this finding after a bench trial, we apply the same standard of review described above.[7] *Leeks Canyon Ranch, LLC*, 2025 WY 63, ¶ 31, 569 P.3d at 1130.

[¶40] The elements of a claim for tortious interference with a contract are:

> (1) The existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional and improper interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Sweetwater Station, LLC v. Pedri*, 2022 WY 163, ¶ 31, 522 P.3d 617, 626–27 (Wyo. 2022) (quoting *Downs v. Homax Oil Sales, Inc.*, 2018 WY 71, ¶ 21, 421 P.3d 518, 524 (Wyo. 2018)).

[¶41] WFC contests only the third element: whether WFC intentionally and improperly interfered with Mr. Messinger's rights under the Purchase Agreement. It argues: 1) Mr. Messinger consented to any interference; 2) the delayed closing was not caused by WFC, but by Wyoming Title and Escrow's waiver requirement; and 3) any interference was justified because WFC was acting in good faith to protect its significant economic interest. We address these arguments in turn.

### A. The district court's finding that Mr. Messinger did not consent to WFC's negotiations with the Andersons after the first right of purchase period was not clearly erroneous.

---

[7] WFC contends the district court erred as a matter of law in finding that it intentionally interfered with Mr. Messinger's rights under the purchase agreement. We disagree with this characterization. The issues raised by WFC are factual issues and we will review them accordingly. *See Scheaffer v. State ex rel. Univ. of Wyo. ex rel. Bd. of Trs.*, 2009 WY 19, ¶ 51, 202 P.3d 1030, 1044 (Wyo. 2009) ("Whether or not interference with a contract was improper is a question of fact."); Restatement (Second) of Torts § 766 cmt. o (1979) ("The question whether the actor's conduct caused the third person to break his contract with the other raises an issue of fact."); *Carlson v. Carlson*, 775 P.2d 478, 484 (Wyo. 1989) (whether interference was a good faith effort to protect economic interests was a question of fact).

[¶42] WFC first argues Mr. Messinger consented to WFC's negotiations with the Andersons after he believed the first right of purchase had expired. Mr. Messinger argues WFC did not raise this issue below and we should not consider it. We disagree. In its written closing argument following the tort trial, WFC claimed "[t]he evidence is undisputed that Messinger, by and through their attorney, gave the Andersons written permission to sell the Property to WFC in November 2017."

[¶43] WFC relies on the following email from Mr. Messinger's attorney to the Andersons's attorney on November 17, 2017:

> As we discussed, Noah and Brandy are not willing to exit their contract with the Andersons (either through termination or through Boerschig's requested assignment) until such time as the Andersons' deal with Boerschig closes. In other words, we would like to remain under contract with the Andersons. Obviously, if and when the Anderson/Boerschig deal closes, we will consider our contract with the Andersons terminated. I'll look for a letter from you from that memorializes the order of contractual priority.

WFC argues that in this email, Mr. Messinger consented to the Andersons and WFC negotiating a sale after WFC's first right of purchase period expired. It further argues that one who consents to interference with his contractual rights cannot claim tortious interference with a contract.

[¶44] The district court rejected WFC's consent theory and made findings to the contrary. It found that the November 17 letter "doesn't give permission to sell the property to WFC, but specifically declines to exit or assign [Mr. Messinger's rights under the] contract." It further found that the letter didn't give permission for the Andersons to negotiate with WFC, but instead assumed there was a deal between the Andersons and WFC already in place and pending closing. Finally, it found that it would be "implausible" to interpret the letter as giving consent when Mr. Messinger refused to assign his rights under the Purchase Agreement to WFC, and when Mr. Messinger urged the Andersons to sue WFC once he learned the Andersons and WFC had no agreement in place.

[¶45] The district court's findings are supported by the record. On its face, the letter does not expressly consent to the Andersons negotiating with WFC after WFC's first right of purchase had expired. Mr. Messinger testified at the contract trial that the email only consented to the Andersons selling to WFC if the sale was "according to the terms" of the first right of purchase. He further testified that he was operating with limited information following the final extended closing date and had assumed the Andersons were trying to obtain a waiver from WFC. He explained that he doubted the Andersons

and WFC had come to an agreement within the right of first refusal period, but that if WFC "had exercised within the 60 days," he would not object to the Andersons selling to WFC. Based on this testimony, the district court did not clearly err in accepting Mr. Messinger's interpretation of the November 17 email and rejecting the alternative interpretation that the email gave the Andersons consent to sell to WFC after WFC's first right of purchase had expired. Because this finding was not clearly erroneous, we reject WFC's argument that Mr. Messinger consented to its interference with his contractual rights.

**B.    The district court did not clearly err in finding WFC's actions caused the Andersons' closing with Mr. Messinger to delay, and the district court did not find against WFC solely because of WFC's refusal to provide a waiver.**

[¶46]  WFC next argues the district court erred in finding it intentionally and improperly interfered with Mr. Messinger's contractual rights because WFC did not cause the November 6 closing to fall through. It argues Wyoming Title and Escrow's requirement that WFC sign a waiver was the primary cause of the delayed closing, not WFC's actions. Relatedly, WFC argues it was not obligated to provide a waiver and its refusal to do so cannot be considered improper.

[¶47]  The district court found Wyoming Title and Escrow only required a waiver after Ms. Anderson told its employees "we'll see who steps up and buys the property." It further found Ms. Andersons' comment "was caused by WFC invalidly and in bad faith purporting to exercise . . . the right of first purchase, followed by inactivity and non-responsiveness, creating confusion, uncertainty, and the prospect of litigation over who was going to purchase the property." It finally found WFC refused to sign a waiver for the purpose of preventing Mr. Messinger's purchase of the property unless Mr. Messinger agreed to WFC's proposal to modify the covenants, which was WFC's true motivation from the outset.

[¶48]  According to Ms. Anderson's notes and testimony, she believed her comments alerted the title company to a potential issue with the first right of purchase, and that they updated the title commitment to include the waiver requirement as a result. At the time she made this comment, the Andersons had been told by Mr. Boerschig's assistant that WFC would exercise its first right of purchase. However, their realtor had also received conflicting information from WFC's realtor that Mr. Boerschig "wants to look into a few things about [Mr. Messinger's] contract before pulling the trigger." Of course, at the time Wyoming Title and Escrow updated the title commitment on October 12, Mr. Messinger's closing date had not yet occurred and all parties believed WFC still had time to exercise its first right of purchase.

[¶49] Prior to Mr. Messinger's original closing date of October 23, however, the Andersons had repeatedly contacted Mr. Boerschig and made him aware that they

believed WFC's purchase right expired before the scheduled closing. Mr. Boerschig did not let them know he believed he had longer or that his first right of purchase period should restart until an October 27 phone call. In the days leading up to Mr. Messinger's original scheduled closing, he instead attempted to negotiate a covenant amendment with Mr. Messinger in exchange for a waiver. Mr. Boerschig repeatedly testified that his plan was to either buy the property or amend the covenants because the covenants were "terrible" and harmed the value of his property. Only on October 27, after Mr. Messinger's initial closing date had passed and all other parties understood WFC's purchase right had expired, did WFC attempt to assert it still had a right to purchase the property.

[¶50]  We are required to view the record in the light most favorable to Mr. Messinger as the prevailing party below. *Leeks Canyon Ranch, LLC*, 2025 WY 63, ¶ 31, 569 P.3d at 1130. Viewed through that lens, the record supports the district court's conclusions that 1) Ms. Anderson's comments led Wyoming Title and Escrow to impose the waiver requirement; 2) Ms. Anderson made those comments due to the uncertainty created by WFC's actions and inactions; 3) WFC was primarily motivated by a desire to amend the covenants; and 4) after WFC could not negotiate its preferred covenant amendment and its first right of purchase had expired, it continued to refuse to sign a waiver, delaying and preventing the Andersons' sale to Mr. Messinger. With these facts established, the district court did not clearly err in attributing the delay in closing to WFC's actions rather than Wyoming Title and Escrow's waiver requirement.

## C.    The district court did not clearly err in finding that WFC did not act in good faith to protect a significant economic interest.

[¶51]  Finally, WFC argues to the extent it did interfere with Mr. Messinger's contractual rights, it did so in good faith to protect its own significant economic interest.

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Sweetwater Station, LLC*, 2022 WY 163, ¶ 34, 522 P.3d at 627 (emphasis removed) (quoting *Sunshine Custom Paints & Body, Inc. v. South Douglas Highway Water & Sewer Dist.*, 2007 WY 206, ¶ 23, 173 P.3d 398, 404 (Wyo. 2007)).

[¶52] WFC asserts "there was an abundance of evidence submitted at trial that WFC had a good-faith intention to purchase the property" and that it was only the dispute over Mr. Viehman's commission that prevented it from doing so. It further argues there was nothing improper about it attempting to negotiate an amendment to the covenants, which reduced the value of its property by approximately $700,000.

[¶53] WFC's arguments amount to an invitation to reweigh the evidence. As discussed above, the district court found WFC was motivated more by a desire to amend the covenants than to purchase the property, and that finding is supported by the record. The district court agreed with WFC that there was nothing improper about WFC attempting to negotiate with Mr. Messinger. What it found to be improper was "when negotiations with [Mr. Messinger] were unsuccessful, WFC used the right of first purchase to obstruct the sale of the property in order to extract a windfall profit, amendment of the covenants at no cost to itself." It was undisputed at trial that WFC's primary goal was to amend the covenants. Whether it pursued that goal in good faith was an issue of fact. *See Sweetwater Station, LLC*, 2022 WY 163, ¶ 35, 522 P.3d at 627 ("[W]hether interference was [a] good faith effort to protect economic interests was [a] question of fact.") (citing *Carlson*, 775 P.2d at 484). WFC continued to claim it had a first right of purchase despite knowing the Andersons believed its first right of purchase had expired and that they intended to sell the property to Mr. Messinger if WFC did not exercise its right. The district court's finding that WFC did not act in good faith in doing so was not clearly erroneous.

### III.    *The district court's punitive damages award against WFC was not unconstitutional.*

[¶54] WFC also argues the district court's punitive damages award was unconstitutionally excessive. Mr. Messinger responds that WFC did not raise this issue below and we should decline to consider it. Even though WFC did not raise this issue with the district court, we will address it because a grossly excessive punitive damages award violates a party's due process rights. *See Jones v. Young*, 2025 WY 130, ¶ 29, 580 P.3d 1026, 1035 (Wyo. 2025) ("[W]e will not consider arguments on appeal that were not presented to the district court, **unless those arguments are jurisdictional or of a fundamental nature**.") (emphasis added) (citing *Sharpe v. Evans*, 2025 WY 70, ¶ 14, 570 P.3d 731, 736 (Wyo. 2025)).

[¶55] Punitive damages are intended to serve public policy by punishing the defendant in order to deter similar conduct by others in the future. *Prancing Antelope I, LLC v. Saratoga Inn Overlook Homeowners Ass'n, Inc.*, 2021 WY 3, ¶ 66, 478 P.3d 1171, 1187 (Wyo. 2021). They are generally disfavored in Wyoming, and should be awarded "only for conduct involving some element of outrage, such as willful or wanton misconduct." *Id.* (internal quotation marks omitted) (quoting *Rosty v. Skaj*, 2012 WY 28, ¶ 34, 272

P.3d 947, 958 (Wyo. 2012)). Attorney fees are available as a form of punitive damages. *Prancing Antelope I, LLC*, 2021 WY 3, ¶ 65, 478 P.3d at 1187.

[¶56]  WFC does not contest the availability of punitive damages against it, nor does it argue the district court abused its discretion in calculating punitive damages or the amount of Mr. Messinger's attorney fees. Instead, it argues the district court's punitive damages award was unconstitutionally excessive. "While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519–20, 155 L.Ed.2d 585 (2003) (citations omitted). The constitutionality of a punitive damages award is reviewed de novo. *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041, 1061 (10th Cir. 2016). Factual findings related to that award, however, are reviewed for clear error. *Id.* at 1063.

[¶57]  To ensure punitive damages are carefully and lawfully calculated, the United States Supreme Court has established "three guideposts" to consider when awarding punitive damages. *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 418, 123 S.Ct. at 1520. We have in turn adopted a seven-factor test that incorporates these guideposts for the finder of fact to use in determining the availability and amount of punitive damages. *Farmers Ins. Exch. v. Shirley*, 958 P.2d 1040, 1044 (Wyo. 1998).[8]

---

[8] The factors are:

> (1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.
>
> (2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.
>
> (3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.
>
> (4) The financial position of the defendant would be relevant.
>
> (5) All the costs of litigation should be included, so as to encourage

[¶58]   The district court applied those factors here. We need not repeat its entire analysis because the district court's order reflects a careful consideration of WFC's conduct and the propriety of punitive damages under the circumstances. Of particular note are the district court's findings that WFC's conduct was the "genesis" of the entire litigation, that WFC "acted for purely self-serving purposes" to increase the value of its property at no cost to itself, that similarly situated plaintiffs might be reluctant to bring similar lawsuits due to the cost and delay in this case, that WFC's conduct was willful and wanton, and that a punitive damages award of Mr. Messinger's reasonable attorney fees would discourage similar conduct in the future.

[¶59]   Still, WFC counters that the award should be reduced so it reflects a 1:1 ratio with the compensatory damages award against it. It argues that in response to the United States Supreme Court precedent discussed above, federal courts "typically award a 1:1 punitive damage ratio, unless the defendant has either intended to cause the substantial compensatory damages or engaged in particularly egregious behavior." The cases it cites are anecdotal and do not impose a bright-line rule requiring a 1:1 ratio. The United States Supreme Court has also refused to impose a bright-line rule, only observing in dicta "that, in practice, few awards exceeding a ***single-digit ratio*** . . . will satisfy due process." *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425, 123 S.Ct. at 1524 (emphasis added). WFC's cases are also distinguishable. WFC relies on *Lompe*, which cites each of the other cases WFC relies on. 818 F.3d at 1073–74. In that case, the Tenth Circuit observed that "many federal courts have imposed a 1:1 ratio where, as here, ***the compensatory damages exceed $1 million***." *Id.* at 1073 (emphasis added).

[¶60]   The ratio here was single digit, and the compensatory damages were well below $1 million. *See State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 425, 123 S.Ct. at 1524; *Lompe*, 818 F.3d at 1073. Moreover, the district court was particularly concerned with the costs WFC's conduct had generated for all parties involved, which the court found to

---

plaintiffs to bring wrongdoers to trial.

(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.

(7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.

*Id.* (internal quotation marks omitted). These factors incorporate the United States Supreme Court's guideposts: 1) the reprehensibility of the conduct; 2) the disparity between the harm suffered and the punitive damages award; and 3) the difference between the punitive damages award and awards in similar cases. *State Farm Mut. Auto. Ins. Co.*, 538 U.S. at 418, 123 S.Ct. at 1520.

be the "genesis" of the entire litigation. Given the district court's findings and careful consideration of the punitive damages factors, particularly its linking of WFC's conduct to the attorney fees Mr. Messinger incurred, we cannot say its punitive damages award violated WFC's due process rights. *See Shirley*, 958 P.2d at 1044 ("Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred.") (quoting *Aetna Life Ins. Co. v. Lavoie*, 505 So.2d 1050, 1062 (Ala.1987)).

## *CONCLUSION*

[¶61]   The district court did not err in ordering the Andersons to specifically perform the Purchase Agreement. Nor did it err in holding WFC liable for tortious interference with Mr. Messinger's rights under the Purchase Agreement. Finally, its award of Mr. Messinger's attorney fees as punitive damages against WFC was not unconstitutional. We therefore affirm the district court in all respects.